BUREAU OF MINES OF MARYLAND ET AL.
*v.* THE GEORGE'S CREEK COAL AND
LAND COMPANY ET AL.

[No. 261, September Term, 1973.]

*Decided July 3, 1974.*

*Motion for rehearing filed July 31, 1974; denied July 31, 1974.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES and LEVINE, JJ., and JERROLD V. POWERS and RICHARD P. GILBERT, Associate Judges of the Court of Special Appeals, specially assigned.

*Henry R. Lord, Deputy Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, and *Warren K. Rich, Special Assistant Attorney General,* for appellants.

*William Walsh,* with whom were *Walsh, Walsh & Reinhart* and *Stephen R. Pagenhardt* on the brief, for appellees.

*Amicus Curiae* brief filed by Citizens Coalition on Surface Mining and The Maryland Conservation Council, Inc., *Thomas B. Eastman* on the brief.

MURPHY, C. J., delivered the opinion of the Court.

Whether the State of Maryland, by legislative enactment, has taken private property for public use without the payment of just compensation is the central issue presented by this appeal.

In 1931, George's Creek Coal Company, Inc. conveyed a tract of land located in Garrett County, Maryland, consisting of 8,621³/₄ acres, to T. H. and F. B. McMillen. The deed excepted from its operation and reserved to the grantor company "all the coal, clay and other minerals, and all the oil and gas ... [underlying the property], together with the right to enter in, upon and under said land and to mine, excavate and remove all said coal, clay and other minerals, and said oil and gas" [the mineral rights]. The deed also reserved to the grantor company the right to construct designated facilities and erect specified structures on the land in connection with its mineral rights, and provided that the grantor would not be liable "for the breaking or subsidence of the surface of said land or for any injury or damage done to the overlying surface thereby or to anything therein or thereon, by the exercise of the rights hereby excepted and reserved, whether or not the same be

caused by or due to the negligent manner in which said mining operations are conducted or said rights are exercised."

In 1937, the McMillens conveyed 5,685 acres of their land (the McMillen tract) to the United States, subject to the mineral rights exception and reservation in favor of George's Creek Coal Company. In 1952, George's Creek Coal Company conveyed all its property in Allegany and Garrett Counties, including all mineral rights excepted and reserved under its 1931 deed to the McMillens, to The George's Creek Coal and Land Company (George's Creek). In 1954, the United States conveyed the McMillen tract to the State of Maryland, subject to the exception and reservation of mineral rights; that property is now a part of the Savage River State Forest (the State Forest). In 1968, in *Department of Forests and Parks v. George's Creek Coal & Land Co.*, 250 Md. 125, 242 A.2d 165 (1968), we held that the reservation of mineral rights in the McMillen tract included the right to remove the coal by the open-pit or strip mining method — a method then defined by Maryland Code (1957, 1967 Repl. Vol.) Art. 66C, § 658 (a) to include auger mining and to mean "the mining or recovery of bituminous coal by removing the strata or material which overlies or is above the coal deposit or seam in its natural condition."

On July 1, 1969 George's Creek leased to the Buffalo Coal Company (Buffalo) "all the coal [which it owned in Allegany and Garrett Counties] together with mining and surface rights necessary for the removal of said coal . . . except such parts thereof from which coal cannot be removed economically by the strip mining method, auger mining method or deep mining method, together with the right to mine coal herein leased by the strip mining method, auger mining method or deep mining method." In order to mine coal by the open-pit or strip method, Buffalo was required by the provisions of Article 66C, § 661 (a) to first obtain a license from the Bureau of Mines for a prescribed fee and to renew that license annually on January 1 of the next succeeding year. In addition to the license requirement, open-pit mining operators were required by the provisions of

Article 66C, § 662 (a), then in effect, to obtain from the Bureau of Mines:

"... a permit for each separate operation, which permit when issued is valid until the operation is completed or abandoned, unless it is sooner suspended by the Director of Bureau of Mines."

Consistent with this latter requirement, Buffalo applied for a permit to the Maryland Bureau of Mines to strip mine 50 acres of land in the State Forest, included within which was part of the McMillen tract; the permit (No. 161) was issued on July 2, 1969, and was thereafter amended a number of times prior to July 1, 1973 to authorize strip mining on a total of 275 acres in the State Forest.

At the 1972 Session of the General Assembly of Maryland, Senate Bill 261 was introduced for the purpose, as expressed in its original title, "to ban strip mining on land owned by the State . . . ." The Bill added a new subsection to Article 66C, § 662 ("Permit Generally") to follow immediately after § 662 (a). As originally introduced, the Bill was to take effect on July 1, 1972, and prohibited the issuance, extension or renewal of any permit to mine coal by the open-pit or strip method on any land owned by the State. During its progress through the General Assembly, the Bill was amended by adding thereto the language appearing in capital letters:

"662. (a-1) (1) The Bureau of Mines shall not issue, extend or renew any permit to mine coal by the open-pit or strip method on any land owned by the State of Maryland whether the ownership includes the mineral rights incident to the land or not, EXCEPT IF THE FAILURE OF THE BUREAU TO ISSUE, EXTEND OR RENEW A PERMIT WILL INVOLVE THE TAKING OF A PROPERTY RIGHT WITHOUT JUST COM-PENSATION IN VIOLATION OF THE CONSTITUTION OF THE UNITED STATES OR THE CONSTITUTION OF MARYLAND AND SUFFICIENT FUNDS HAVE NOT BEEN APPROPRIATED BY THE GENERAL AS-

SEMBLY TO PAY SUCH COMPENSATION. FUNDS AVAILABLE UNDER PROGRAM OPEN SPACE MAY BE USED BY THE STATE TO PURCHASE OR OTHERWISE PAY FOR SUCH PROPERTY RIGHTS.

"(2) Any person who mines coal by the open-pit or strip method without a permit issued by the Bureau of Mines shall be guilty of a misdemeanor punishable by a fine of not less than $1000 nor more than $10,000 or by imprisonment for not more than two years, or by both fine and imprisonment. Each day a violation hereunder exists shall be a separate offense.

"(3) In addition to any fine imposed by a violation of this section, every person convicted hereunder shall pay to the Director a sum sufficient to reclaim the area mined."

The Bill's title was also amended to conform with the amendment to the body of the Bill; the title amendment appears in capital letters:

" ... to ban strip mining on land owned by the State IN CERTAIN INSTANCES, TO PROVIDE THAT CERTAIN FUNDS MAY BE USED FOR THE PURCHASE OF PROPERTY RIGHTS and providing penalties for the violation thereof."

Senate Bill 261, as amended, was enacted as Chapter 355 of the Acts of 1972, and originally codified as Code, Article 66C, § 662 (a-1). Significantly, the Bill's effective date was also amended from July 1, 1972 to July 1, 1973.

On June 1, 1973, Buffalo sought a further amendment of its strip mining permit (No. 161) to encompass additional acreage in the State Forest. By letter dated June 19, 1973, the Bureau of Mines informed Buffalo that the provisions of Chapter 355 required "the stoppage of all open-pit mining of State-owned land as of July 1, 1973" and directed Buffalo to terminate its strip mining operations in the State Forest.

On June 28, 1973, George's Creek and Buffalo filed a Bill

of Complaint for Declaratory Relief in the Circuit Court for Garrett County; they sought a declaration, among others, (a) that Chapter 355 did not require that all strip mining operations cease as of July 1, 1973; (b) that Buffalo's right to strip mine on land covered by Permit No. 161 prior to July 1, 1973 was not affected by the Act; (c) that Chapter 355 provided an exception to its proscription of the issuance of strip mining permits where the failure to issue such permits would result in an unconstitutional taking of property, and that since the prohibition of strip mining on the McMillen tract would constitute such a taking, Chapter 355 permitted such operations to continue until and unless just compensation had been paid; and (d) that if Chapter 355 was interpreted so as not to provide such an exception, but required either the prohibition of strip mining operations on land covered by Permit No. 161 as of July 1, 1973, or the denial of amendments to that permit to allow strip mining on other areas of the McMillen tract after that date, it would constitute a taking of property without payment of just compensation in violation of the state and federal constitutions. Answering the Bill of Complaint, the State maintained that Chapter 355 was a proper exercise of its police powers, that it required that all strip mining on State-owned land cease on July 1, 1973, and that such a prohibition did not constitute a taking of the property of George's Creek and Buffalo, requiring monetary compensation.

Evidence was adduced at the trial which showed that strip mining operations necessarily involve the disturbance of large amounts of land; that Buffalo utilizes bulldozers, draglines, shovels, and front-end loaders in its strip mining operations; that when stripping a new area, Buffalo clears the surface to the base soil, removing all trees and vegetation; that the cleared surface material is bulldozed to the out-slope of the toe of the soil; that the topsoil is saved and is usually pushed off with the bulldozer to the high wall side after this area is cleared of vegetation; that following removal of the topsoil, the dragline will begin a cut and the rock and overburden above the coal is stripped and cast off

on the low side; that after the overburden is stripped, the coal is loaded either with a shovel or a front-end loader and hauled to a railroad car at the shipping point.[1]

The evidence showed that George's Creek, a holding company, did not directly engage in any mining operations. Its lease with Buffalo provided for royalty payments based on the method employed to mine the coal and the tonnage removed. The lease was for an initial two-year term — from July 1, 1969 to June 30, 1971 — and was renewable at Buffalo's option. From July 1, 1971 to October 5, 1972, Buffalo operated under an oral lease with George's Creek; by an "Amendment of Lease" dated October 5, 1972, Buffalo renewed the lease for a two-year period, beginning July 1, 1972 and ending June 30, 1974. As of July 1, 1973, 94 acres of land covered by Buffalo's Permit No. 161, including part of the McMillen tract, had not been mined and considerable acreage underlying the McMillen tract had never been placed under permit. Since initiating its operation in the State Forest in 1969, Buffalo strip mined 692,000 tons of coal and paid George's Creek approximately $190,000 in royalties.

Carl DelSignore, Buffalo's president, testified that while Buffalo operated the largest deep mine in Maryland, it was not economically feasible to deep mine coal underlying the State Forest and McMillen tract unless it could first strip mine the coal. He said that because of federal safety laws governing the extraction of deep mine coal and the marginal quality of such coal, "the economics are not there" and Buffalo "couldn't make any money." He testified that although clay had been located on the property, it was not commercial clay and could not be reached without strip mining. DelSignore testified that to his knowledge there had been no exploration for gas or oil or other minerals on the

---

1. That strip mining leads to the "scarification and uglification" of the land is a matter of which we took cognizance in Department of Forests & Parks v. George's Creek Coal & Land Co., *supra*, at 125. We noted in that case that strip mining has been a widely known and well-understood method of recovering coal in Maryland at least since 1918. Equally well understood is the fact that strip mining destroys the surface of the land, causes soil erosion, stream pollution, destruction of wildlife and vegetation. The evils of strip mining are briefly chronicled in Maryland Coal and Realty v. Bureau of Mines, 193 Md. 627, 69 A. 2d 471 (1949).

property, and he did not know of the existence of any minerals of value other than coal.

Frank Zachar, a mining engineer and the expert produced on behalf of Buffalo and George's Creek, testified that approximately 3,356,000 tons of recoverable coal are contained on the McMillen tract — 1,976,000 tons recoverable by strip and auger mining methods and 1,380,000 tons recoverable by deep mining methods. The State's expert, James Coffroth, a mining geologist employed by the Maryland Geological Survey, testified that 3,533,875 tons of coal exist on the McMillen tract; he stated that the majority of the strippable seams had been removed and estimated that only 346,375 tons could be extracted by strip and auger mining methods, while 3,187,500 tons could be recovered by deep mining methods.

Zachar testified that it was within his area of expertise to examine mineral properties to determine if minerals existed thereon that could be economically mined. He said that to be "economically mined," minerals must be capable of being mined "so that the cost of mining and preparing for shipment is less than the realization and that a profit can be made from the product. He stated his opinion that without the right to strip mine or auger mine the coal the deep mine coal could not be economically recovered and therefore the right to mine it had no value. Zachar testified that, in his opinion, there were no minerals of value on the McMillen tract other than coal; that there were no stones suitable for building purposes; and that the clay underlying the coal was never proven and could not be recovered without strip mining methods. Zachar was not familiar with gas and oil leases on the property and had done no work to determine the existence of gas and oil reserves on the McMillen tract.

The evidence revealed that George's Creek had leased its 7/8ths interest in gas and oil on the McMillen tract at a rate of $1 per acre, totaling 7/8ths of $5,685 per year; that the leases were subject to cancellation by the lessee at any time; and that such leases were common in the area. Fred A. Thayer, a realtor, lawyer, and banker in Garrett County, testified that while much acreage in Garrett County was

subject to oil and gas leases "as a result of the exploration and finding of gas fields in the area," his bank would not accept such a lease as collateral for a loan. The testimony revealed that no other leases of the rights to gas, oil or any other minerals had been previously made by George's Creek. George H. Bortz, President of George's Creek, stated that the company had never conducted any surveys to establish the existence of oil or gas reserves or fire-clay on the McMillen tract.

After summarizing the evidence adduced before it, and reviewing the provisions of Chapter 355, the court (Hamill, J.) stated in an opinion filed on November 25, 1973 that the statute:

> ". . . does not indicate or say that existing permits are to be canceled and that coal stripping operations are to cease on that date [July 1, 1973]. If the Legislature had intended that permits and strip mining operations were to cease on that date, it would have been a simple enough matter to have so stated in the law. . . ."

Operating upon this premise, the court held that the Bureau of Mines "should not have ordered the shutdown of . . . Buffalo . . . on July 1, 1973, who was then operating under an existing Permit No. 161, and that such order should not issue until the operation of the acreage under that permit was completed or abandoned . . . [after which] Chapter 355 would apply and no further issuance, extensions or renewals (amendments) to Permit No. 161 would be granted."

The court next concluded that the State, acting under its police powers, could constitutionally enact legislation to abolish strip mining on State-owned property where the mineral rights were in the ownership of another. But it noted that Chapter 355 "provides an exception to the requirement that the Bureau of Mines not issue, extend or renew (amend) any permit where there is the taking of a property right without just compensation which would be in violation of the Constitution of the United States and the Constitution of Maryland." The court said:

"... This would indicate that the intention of the Legislature is that the Bureau of Mines shall not refuse to issue, extend or renew (amend) any permit in any case where there is a property taking and just compensation has not been paid. It would appear, therefore, that the Bureau of Mines must issue, extend or renew (amend) any such permit up to the time that the State has paid just compensation for the taking."

The court concluded with these observations:

"The evidence and testimony in this case shows that the clay underlying the coal on this property has no known value whatsoever, and with regard to the gas and oil lease, the testimony shows that, when compared with the value of coal, it has no significant value whatsoever, except delayed rental payments in the amount of $1.00 per year per acre. This is especially true considering that under the terms of said lease, which is in evidence in this case, the lessee has the absolute right to cancel same at any time. The testimony, and particularly the testimony of Mr. Frank Zachar, clearly shows that there is a substantial property right involved and one of considerable value in the coal underlying the land in question. His testimony, which the Court gave considerable weight, further reveals that the principal value is the strippable coal and that the deep mine coal could not be practically or economically mined until after the stripping was done.

"Since there has been no compensation paid by the State for this property taking, the Bureau of Mines, under Chapter 355 (1972) will be required to continue the issuance, extension or renewal (amendments) of the right of Buffalo Coal Company to continue its strip mine operations until the Plaintiffs are paid just compensation for the taking."

From the court's decree so declaring the rights of the parties, the State has appealed.

I

At the time Chapter 355 was enacted, Buffalo's operation in the State Forest and on the McMillen tract was the only strip mining operation being conducted on State-owned land and had been the only such operation on State land in over fifteen years. We think the Legislature, by enacting Chapter 355 at its 1972 Session, but delaying its effective date until July 1, 1973, intended this result: (a) to prohibit strip mining on State-owned land after July 1, 1973 by forbidding the issuance, extension or renewal of permits after that date; (b) that if the prohibition of strip mining on State-owned land was not a valid exercise of the State's police power but rather constituted a taking of private property for public use, just compensation would have to be paid; (c) that the General Assembly would appropriate funds to pay such compensation and make them available by July 1, 1973; and that if no such appropriation was made, funds available under the State's open space program could be used. This interpretation is consistent with the recodification of Chapter 355 accomplished by Chapter 4 of the Acts of the First Extraordinary Session of 1973, which became effective on January 1, 1974. Chapter 4 recodified the natural resources law of the State previously codified in Article 66C of the Code, Chapter 355 being recodified therein, in part, as § 7-505 (b) of the Natural Resources Article, as follows:

"§ 7-505 (b) *Bureau prohibited to issue, extend or renew permit for state-owned land.* — The bureau may not issue, extend or renew any permit to mine coal by the open-pit or strip method on any land the state owns whether or not the ownership includes mineral rights incident to the land. If the bureau's failure to issue, extend or renew a permit involves taking a property right without just compensation in violation of the Constitution of the United States or the Constitution of Maryland and the General Assembly has not appropriated

> sufficient funds to pay the compensation, the state may use available funds under Program Open Space to purchase or otherwise pay for the property rights."

The revisor's note to § 7-505 states that only changes of style were made in the recodification of Chapter 355. While § 10 of Chapter 4 provides that the revisor's notes shall not become law or be deemed to have been enacted as part of the recodification, it is well settled that because "the principal function of a Code is to reorganize the statutes and state them in simpler form, changes are presumed to be for the purpose of clarity rather than for a change in meaning." *Welsh v. Kuntz*, 196 Md. 86, 97, 75 A. 2d 343 (1950). Even a change in the phraseology of a statute in a codification will not as a general rule modify the law, unless the change is so radical or material that the intention of the Legislature to modify the law appears unmistakably from the language of the Code. *Welch v. Humphrey*, 200 Md. 410, 417, 90 A. 2d 686 (1952). While Chapter 355, as codified in § 7-505, more clearly indicates the legislative purpose and intent than does the original wording contained in the Act, we conclude that the Legislature intended no substantive change in Chapter 355 when it adopted § 7-505.

We thus conclude, consistent with the view taken by the lower court, that Chapter 355 did not circumscribe Buffalo's right to continue, after July 1, 1973, to operate under Permit No. 161 until the balance of the acreage therein described and placed under permit prior to July 1, 1973 was strip mined. We disagree, however, with the lower court's conclusion that the Bureau of Mines was empowered, after July 1, 1973, to issue, extend, renew, or amend strip mining permits on State-owned land. We think Chapter 355 flatly mandates termination of all strip mining on State land on and after July 1, 1973, with the singular exception of that acreage covered by Permit No. 161 prior to that date — some 94 acres as of July 1, 1973 according to the evidence in the case. The question remains whether, as applied to the property of Buffalo and George's Creek, the prohibition mandated by Chapter 355 was a valid exercise of the State's

police power not requiring the payment of compensation or whether, absent the payment of compensation, it would constitute a deprivation of property without due process of law under the Fourteenth Amendment, Article 23 of the Maryland Declaration of Rights,[2] and Article III, § 40 of the Constitution of Maryland.[3] That these constitutional provisions have the same meaning and effect in reference to an exaction of property, and that the decisions of the Supreme Court on the Fourteenth Amendment are practically direct authorities, was settled in *Allied American Co. v. Comm'r*, 219 Md. 607, 150 A. 2d 421 (1959).

The question of when governmental action amounts to a compensable taking of private property has frequently been before the Supreme Court. In *United States v. General Motors Corp.*, 323 U. S. 373, 65 S. Ct. 357, 89 L. Ed. 311 (1945), the Government sought, through condemnation, to acquire use for one year of premises for military purposes during World War II from a long-term lessee of that property. Addressing itself to the question of the proper method of determining compensation, the Court offered the following analysis:

> "The critical terms are 'property,' 'taken' and 'just compensation'. It is conceivable that the first was used in its . . . untechnical sense of the physical thing with respect to which the citizen exercises rights recognized by law. On the other hand, it may have been employed in a more accurate sense to denote the group of rights inhering in the citizen's relation to the physical thing, as the right to

---

2. Article 23 of the Maryland Declaration of Rights reads, as follows:

"That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

3. Article III, § 40 of the Constitution of Maryland reads, as follows:

"The General Assembly shall enact no Law authorizing private property, to be taken for public use, without just compensation, as agreed upon between the parties, or awarded by a Jury, being first paid or tendered to the party entitled to such compensation."

possess, use and dispose of it. In point of fact, the construction given the phrase has been the latter. When the sovereign exercises the power of eminent domain it substitutes itself in relation to the physical thing in question in place of him who formerly bore the relation to that thing, which we denominate ownership. In other words, it deals with what lawyers term the individual's 'interest' in the thing in question. That interest may comprise the group of rights for which the shorthand term is 'a fee simple' or it may be the interest known as an 'estate or tenancy for years', as in the present instance. The constitutional provision is addressed to every sort of interest the citizen may possess.

"In its primary meaning, the term 'taken' would seem to signify something more than destruction, for it might well be claimed that one does not take what he destroys. But the construction of the phrase has not been so narrow. The courts have held that the deprivation of the former owner rather than the accretion of a right or interest to the sovereign constitutes the taking. Governmental action short of acquisition of title or occupancy has been held, *if its effects are so complete as to deprive the owner of all or most of his interest in the subject matter, to amount to a taking.*" [4] (Emphasis supplied.) 323 U. S. at 377-78.

The question of when governmental regulation of the use

---

4. This analysis was made in reference to cases involving effects of governmental action, not in the form of regulation, which were akin to an invasion of property. *See* Richards v. Washington Terminal Co., 233 U. S. 546, 34 S. Ct. 654, 58 L. Ed. 1088 (1914) (involving the effects of the operation of a railroad and its terminal on nearby land); United States v. Welch, 217 U. S. 3, 30 S. Ct. 527, 54 L. Ed. 787 (1910) (involving a farm flooded by a government dam). The case was distinguished in United States v. Causby, 328 U. S. 256, 66 S. Ct. 1062, 90 L. Ed. 1206 (1946), where the Court held that, in a case in which the Government was in effect using a part of the respondent's land for the flight of its planes, such an immediate and direct intrusion with his enjoyment of the property constituted a taking where such damage was substantial. *See also* United States v. Cress, 243 U. S. 316, 37 S. Ct. 380, 61 L. Ed. 746 (1917).

of private property amounts to a taking requiring payment of compensation has proved troublesome; though the protection afforded by the Fifth Amendment — that private property not be taken for public use without compensation — has been made applicable to the States by its incorporation through the due process clause of the Fourteenth Amendment, *Chicago, B. & Q. R.R. v. Chicago,* 166 U. S. 226, 17 S. Ct. 581, 41 L. Ed. 979 (1897), that protection is qualified by the rightful exercise of the police power. The extent of that qualification has long provided a source of difficulty.

In *Mugler v. Kansas,* 123 U. S. 623, 8 S. Ct. 273, 31 L. Ed. 205 (1887), a Kansas statute prohibited the sale and manufacture of liquor for purposes other than medical, scientific and mechanical uses, and declared all property used for the sale and manufacture of liquor for purposes not so exempted, to be nuisances subject to abatement. The petitioners, manufacturers of liquor for general consumption, argued that their breweries, which were erected prior to the passage of the statute when it was lawful to engage in the manufacture and sale of liquor for any purpose, would have no value or would at least be materially diminished in value by the operation of the statute. They contended that the statute could not be enforced against those "who, at the time, happen to own property, the chief value of which consists in its fitness for such manufacturing purposes, unless compensation is first made for the diminution in the value of their property, resulting from such prohibitory enactments." The Court rejected that argument, distinguishing the State's exercise of the police power from its exercise of the power of eminent domain. The Court noted:

> "It cannot be supposed that the states intended, by adopting that amendment, [the Fourteenth Amendment] to impose restraints upon the exercise of their powers for the protection of the safety, health, or morals of the community. . . ."

* * *

"The principle that no person shall be deprived of life, liberty, or property without due process of law, was embodied, in substance, in the constitutions of nearly all, if not all, of the states at the time of the adoption of the fourteenth amendment; and it has never been regarded as incompatible with the principle, equally vital, because essential to the peace and safety of society, that all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community."
8 S. Ct. at 298-99.

The Court continued:

"[T]he present case must be governed by principles that do not involve the power of eminent domain, in the exercise of which property may not be taken for public use without compensation. A prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed *a taking or an appropriation of property* for the public benefit. . . . The power which the states have of prohibiting . . . use by individuals of their property, as will be prejudicial to the health, the morals, or the safety of the public, is not, and, consistently with the existence and safety of organized society, cannot be, burdened with the condition that the state must compensate such individual owners for pecuniary losses they may sustain, by reason of their not being permitted, by a noxious use of their property, to inflict injury upon the community. The exercise of the police power by the destruction of property which is itself a public nuisance, or the prohibition of its use in a particular way, whereby its value becomes depreciated, is very different from taking property for public use, or from depriving a person of his property without due process of law. In the

one case, a nuisance only is abated; in the other, unoffending property is taken away from an innocent owner." (Emphasis added.)
8 S. Ct. at 301.

Thus the Supreme Court recognized a distinction in kind between regulation under the police power and the exercise of eminent domain — so long as the regulation constitutes a valid exercise of the police power, bearing a substantial relation to the protection of the public welfare, due process is afforded and no compensable taking has occurred even though the exercise of that power may often extend to the destruction of property.

In *Hadacheck v. Sebastian*, 239 U. S. 394, 36 S. Ct. 143, 60 L. Ed. 348 (1915), the Supreme Court again considered the question of a taking of private property in the context of state regulation under the police power. There, the petitioner was convicted for violating a statute prohibiting the establishment of a place of manufacture or burning of bricks within the City of Los Angeles. The petitioner owned land in the city, containing a valuable bed of clay; the value of his property was $800,000 for brickmaking purposes but did not exceed $60,000 for residential purposes. He claimed that due to excavation on the property, it could not be used for residential purposes and that the statute, if valid, completely deprived him of the use of his property. The State made no specific denial as to the value of the petitioner's property, but generally denied that the statute *entirely* deprived him of the use of his property. The Court noted that the lower court based its holding upon the proposition that "the business [was] one which could be regulated, and that regulation was not precluded by the fact 'that the value of investments made in the business prior to ... [the] legislative action ... [was] greatly diminished.'" The Court upheld that judgment and the regulation under the police power of a lawful business not deemed a public nuisance, characterizing that power as "one of the most essential powers of government, — one that is the least limitable. . . . A vested interest cannot be asserted against it because of conditions once obtaining. . . . To so hold would

preclude development and fix a city forever in its primitive conditions." 239 U. S. at 410. The Court further noted the petitioner's allegation that the manufacture of brick must necessarily be carried on where suitable clay is found, and that the clay on his property could not be transported to some other locality. The Court stated:

> "This is not urged as a physical impossibility, but only, counsel say, that such transportation and the transportation of the bricks to places where they could be used in construction work *would be prohibitive 'from a financial standpoint.'* But upon the evidence the supreme court considered the case, as we understand its opinion, *from the standpoint of the offensive effects of the operation of a brickyard, and not from the deprivation of the deposits of clay . . . .*" (Emphasis added.)
> 239 U. S. at 411.

Thus the Court continued to recognize a basic distinction between the exercise of the police power and that of eminent domain, but characterized the case as one in which the police power justified a substantial diminution in the value of the property rather than the total destruction of such value or prohibition of its every use. The Court rejected the argument that the statute constituted a taking because it made such use of the clay "financially prohibitive," and distinguished the regulation from one which completely prohibited owners of real property from extracting minerals therefrom.

In *Pennsylvania Coal Co. v. Mahon,* 260 U. S. 393, 43 S. Ct. 158, 67 L. Ed. 322 (1922), the Supreme Court articulated a different approach to the question of "takings" and regulation of the use of property under the police power. In that case, the plaintiffs brought an action to enjoin the coal company from mining under their residence in such a way as to cause a subsidence of its surface. The company had conveyed the tract to the plaintiffs, reserving the right to remove all the coal under that tract, and the grantees agreed to take the risk and waive all claims for damage that might arise from the mining of the coal. The plaintiffs maintained

that because a Pennsylvania statute subsequently enacted prohibited the mining of coal in any manner that would cause subsidence of any structure used for human habitation, any public structure, public street or passageway, the coal company's right to mine under their residence had been nullified. The Pennsylvania court held that the statute as applied to the company's right to mine coal was a valid exercise of the police power. The Supreme Court reversed that judgment, holding that the statute amounted to an unconstitutional taking of the company's property without payment of compensation in violation of the Fourteenth Amendment. Justice Holmes, speaking for the Court, noted: .

> "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized some values are enjoyed under an implied limitation and must yield to the police power. But obviously the implied limitation must have its limits or the contract and due process clauses are gone. One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to sustain the act."
>
> 260 U. S. at 413.

Turning to the particular case before it, the Court said:

> "This is the case of a single private house. . . . [U]sually in ordinary private affairs the public interest does not warrant much of this kind of interference. . . . The damage is not common or public. . . . If we were called upon to deal with the plaintiffs' position alone we should think it clear that the statute does not disclose a public interest sufficient to warrant so extensive a destruction of the defendant's constitutionally protected rights."
>
> Id. at 413-14.

The Court then considered the broader question of the general validity of the statute as applied to the mining of coal "under streets or cities in places where the right to mine such coal has been reserved." Noting that "[w]hat makes the right to mine coal valuable is that it can be exercised with profit," and that "[t]o make it commercially impracticable to mine certain coal has very nearly the same effect for constitutional purposes as appropriating or destroying it," the Court held that the statute could not be sustained as a valid exercise of the police power. It said that the rights of the public in a street purchased or laid out by eminent domain are "those that it has paid for"; that although the protection against takings of private property for public use without compensation was qualified by the proper exercise of the police power, that qualification could not be extended "until at last private property disappears." The Court stated the general rule that "*while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking*," and held that "[s]o far as private persons or communities have seen fit to take the risk of acquiring only surface rights, we cannot see that the fact that their risk has become a danger warrants the giving to them greater rights than they bought." 260 U. S. at 416. The Court concluded:

> "We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Id.* at 416.

Although described as merely "one fact to be considered," diminution of the property in economic terms — the reduction of its value — would appear to constitute the thrust of the *Mahon* opinion, and embrace the principle earlier enunciated in *Hudson County Water Co. v. McCarter*, 209 U. S. 349, 28 S. Ct. 529, 52 L. Ed. 828 (1908), that where regulation would render the property "wholly useless, the rights of property would prevail over the other public interest, and the police power would fail. To set such a limit would need compensation and the power of eminent domain."

In *Goldblatt v. Town of Hempstead, New York,* 369 U. S. 590, 82 S. Ct. 987, 8 L. Ed. 2d 130 (1962), an action was brought to enjoin the petitioner from mining sand and gravel on his property in violation of a town ordinance which prohibited any excavation below the level of the water table. The petitioner owned 38 acres of land in the town, on which he had mined sand and gravel for many years prior to the enactment of the ordinance. He claimed that the ordinance was not a regulation of his business, but rather a confiscation in that it entirely prohibited him from conducting his business on that property. The Court said at 592:

> "Concededly the ordinance completely prohibits a beneficial use to which the property has previously been devoted. However, such a characterization does not tell us whether or not the ordinance is unconstitutional. It is an oft-repeated truism that every regulation necessarily speaks as a prohibition. If this ordinance is otherwise a valid exercise of the town's police powers, the fact that it deprives the property of its most beneficial use does not render it unconstitutional. [citing *Mugler* and *Hadacheck*]"

After citing *Mugler's* distinction between the exercise of the police power and the exercise of the power of eminent domain, the Court stated:

> "This is not to say, however, that governmental action in the form of regulation cannot be so onerous as to constitute a taking · which constitutionally requires compensation. [citing *Pennsylvania Coal Co. v. Mahon*] . . . There is no set formula to determine where regulation ends and taking begins. Although a comparison of values before and after is relevant, *see Pennsylvania Coal Co. v. Mahon, supra,* it is by no means conclusive, *see Hadacheck v. Sebastian, supra,* where a diminution in value from $800,000 to $60,000 was upheld. How far regulation may go before it

becomes a taking we need not now decide, for there is no evidence in the present record which even remotely suggests that prohibition of further mining will reduce the value of the lot in question." 369 U. S. at 594.

Concluding that the prohibitory effect of the ordinance was not sufficient to render it an unconstitutional taking if it were otherwise a valid police regulation, the Court upheld the ordinance.

The principles of law which emerge from these cases are well summarized in 16 Am. Jur. 2d *Constitutional Law* § 301 (1964), it being there said that because police laws and regulations prevent the enjoyment of certain individual rights in property without providing compensation therefor does not necessarily render them unconstitutional as violating the due process clause or as appropriating private property for public use without compensation; that such laws, when reasonable and adapted to the scope and objects covered by the police power are not considered as appropriating private property for public use, but simply as regulating its use and enjoyment by the owner; that if the property owner suffers injury, it is either damnum absque injuria, or, in the theory of the law, he is compensated for it by sharing in the general benefits which the regulations are intended and calculated to secure; that acts done in the proper exercise of the police power which merely impair the use of property do not constitute an unconstitutional taking; that the police power which the states possess to prohibit such use by individuals of their property as will be prejudicial to the health, morals or safety of the public is not burdened with the condition that the state must compensate such individual owners for pecuniary loss they may sustain by reason of their not being permitted, by a noxious use of their property, to inflict injury upon the community; but that there is a definite limit to the extent to which the Legislature may restrict the use of property under the police power so that if regulation goes too far, it will be recognized as a taking. These principles are generally recognized and applied in the Maryland cases. *See, e.g., Potomac Sand &*

*Gravel v. Governor*, 266 Md. 358, 293 A. 2d 241 (1972); *Spaid v. Board of Comm'rs*, 259 Md. 369, 269 A. 2d 797 (1970); *Stevens v. City of Salisbury*, 240 Md. 556, 214 A. 2d 775 (1965); *Baltimore City v. Borinsky*, 239 Md. 611, 212 A. 2d 508 (1965); *Cities Service Co. v. Co. Comm.*, 226 Md. 204, 172 A. 2d 523 (1961); *Krieger v. Planning Commission*, 224 Md. 320, 167 A. 2d 885 (1961). Of course, the police power of the State includes everything essential to the public health, morals and safety. And beyond this, the State may interfere whenever the public welfare demands it, a large discretion necessarily being vested in the Legislature to determine what the welfare of the public requires and what measures are necessary for the promotion of the public welfare. *Maryland Coal & Realty Co. v. Bureau of Mines*, 193 Md. 627, 69 A. 2d 471 (1949). In upholding the constitutionality of a statute requiring the making of contributions to miners' relief funds against challenge on the ground that it constituted a deprivation of property without payment of just compensation, our predecessors held that the police power "extends to the protection of lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the State, and persons and property are subjected to all kinds of restraints and burdens in order to secure the general comfort, health and prosperity of the State." *American Coal Co. v. Allegany Co.*, 128 Md. 564, 573, 98 A. 143 (1916). It has been said that while the exercise of the police power "sometimes causes uncompensated expense . ... the State itself cannot under the guise of the police power take private property for public use without compensation." *Capital Transit Co. v. Bosley*, 191 Md. 502, 514, 62 A. 2d 267 (1948). But the due process clause does not, any more than the contract clause, inhibit a state from insisting that all contract and property rights are held subject to the fair exercise of the police power; the exercise of the power is fair when the purpose is a proper public one and the means employed bear a real and substantial relation to the end sought and are not arbitrary or capricious. *Bruce v. Director, Dept. of Chesapeake Bay Affairs*, 261 Md. 585, 276 A. 2d 200 (1971); *Allied American Co. v. Comm'r, supra.* As we observed in the last cited case, the Supreme Court

said in *Erie R.R. Co. v. Williams*, 233 U. S. 685, 700, 34 S. Ct. 761, 58 L. Ed. 1155 (1914), that it was "hardly necessary to say that cost and inconvenience (different words, probably, for the same thing) would have to be very great before they could become an element in the consideration of the right of a State to exert its reserved power or its police power."

We have frequently considered the question of whether governmental regulation of the use of land amounts to a taking in zoning cases. In *Baltimore City v. Borinsky, supra*, the Zoning Board denied the appellee's application to construct a warehouse on her property. That property was situated in a residential zone and was improved by 43 garages of which nine or ten were rented for storage of miscellaneous items from time to time. In affirming the denial of the appellee's application, we stated the applicable test to determine whether a zoning restriction amounted to unconstitutional taking:

> "If the owner *affirmatively demonstrates* that the legislative or administrative determination *deprives him of all beneficial use of the property,* the action will be held unconstitutional. But the restrictions imposed must be such that the property cannot be used for any *reasonable purpose. It is not enough for the property owners to show that the zoning action results in substantial loss or hardship. . . ."* (Emphasis supplied.)
> 239 Md. at 622.

We noted that in the testimony before the Zoning Board, the appellee's witnesses testified that the property could not "economically or feasibly [be] used for residential purposes." The appellee's brother, an owner of the property, testified that the garages were no longer rentable for the storage of automobiles; that he and his sister had tried to sell the property for residential purposes without success; and that "the lot ... [could not] be sold or used for residential purposes." An architect testified that he found the site "not feasible for residential construction, because of ... [its] shape and depth" and stated that although five homes

utilizing approximately 52% of the property could be built, leaving 48% of the property for extended back yards or parks, he doubted that such development would be "income producing." A developer and real estate expert testified that it would be economically unsound to build houses on the land and that the use of the land for residential purposes would be " 'economic suicide.' " He testified that it would be " 'most difficult' to secure financing for the construction of residential dwellings on the property."

We stated that although we had found unconstitutional takings by zoning action based "on expert opinion testimony, when that opinion was factually supported . . . when the expert opinion testimony was not supported by substantial factual evidence, we have held that general claims of economic unfeasibility are not sufficient to prove an unconstitutional taking." We observed from the testimony that five row houses could be built on the tract and that areas in its immediate vicinity were occupied almost entirely by residences. Noting that it was not shown how much revenue was being derived from the rental of the garages for storage, and that the appellee intimated that such storage could not be permitted under the zoning regulations, we said, "the burden is on the Appellee to show that her property cannot be used for any reasonable purpose. Part of it, at least, brings in some income, and the Appellee has not affirmatively proved that this use cannot be legally continued." We said:

> "The testimony that the property had been offered for sale for residential purposes, without success, was not supported by evidence of the price at which the property had been offered. The testimony that the building of the five row houses was not economically feasible was not supported by any evidence of the cost of the erection of such houses, the sales or rental value of the houses, if built, or the extent of the occupancy and the marketability of similar houses in the neighborhood. That real estate developers were not interested in the project does not necessarily mean

that it was economically unfeasible for the property owners themselves to build one or more houses for sale or rental. There was no specific evidence that the owners had attempted to finance the building of the houses and had been unsuccessful. Nor was there any evidence that the property could not be economically used for purposes other than individual residences, permissible under the present zoning, as, for example, a small apartment house, church or synagogue."

\* \* \*

". . . In this case, as we have pointed out, while the areas to the west of the property are commercial and there is a commercial structure on the other side of Quantico Avenue, the area to the east and north are residential in nature. . . . [T]here is no specific evidence as to the cost or marketability of the five row houses which can be erected, nor any testimony that the property cannot be used for permitted non-residential purposes, while admittedly a portion of the property, even at the present time, and despite the dilapidation which the owners have permitted, brings in at least some revenue."
239 Md. at 623-25.

Having concluded that the appellee had not sustained the burden of showing that the zoning of her property and the refusal of the Board to allow an exception therefrom constituted a taking, we considered the question of whether the governmental action was otherwise arbitrary, unreasonable or discriminatory. We stated:

"[T]he Board could reasonably have found from the testimony and the inferences fairly deducible therefrom, that, under the present zoning, the Appellee can derive some income from her property. . . ."

\* \* \*

"It is unnecessary for us to add to what we have said above as to our holdings that mere financial hardship or an opportunity to obtain an increased return from the property is not sufficient to show the zoning action is illegal. The topography of the Appellee's tract, because of its triangular nature, is such that only slightly more than one-half of her ground can be used for row houses. But even if this circumstance reduces the value of her property under its present zoning to one-half or less of what the worth would be if the exception were granted, that is not enough to make the Board's refusal illegal. In [*Marino v. City of Baltimore*, 215 Md. 206, 137 A. 2d 198 (1957),] there was testimony that the commercial value of the property was ten times that for residential use; we held that the application for the erection of a store building was not illegally denied. . . ."
239 Md. at 626-27.

*Borinsky* clearly states the test we have adopted to determine whether a zoning regulation constitutes a taking of property — the regulation must deprive such property of all reasonable use. *See also Spaid v. Board of Comm'rs and Cities Service Co. v. Co. Comm., supra.* Likewise, it emphasizes the preeminence of economic value in determining whether all reasonable use has been taken, while recognizing that substantial diminution in value is constitutionally permissible. Further, *Borinsky* recognizes the "heavy burden" assumed by a party claiming an unconstitutional deprivation of his property and that expert opinion, unsubstantiated by fact, will not support such a finding. In reaching our decision in that case, we distinguished *Frankel v. City of Baltimore*, 223 Md. 97, 162 A. 2d 447 (1960). We there held that the Zoning Board's denial of the appellant's application to construct an office building in a residential use district was arbitrary and capricious. We found that the conclusions of the appellant's experts that the zoning ordinance, as applied to his property,

deprived it of use for any reasonable purpose, were supported by the "uncontrovertible physical facts." We said:

> "When this occurs, zoning goes beyond permissible and legal regulation and must yield to the rights of the property owner. . . . [I]f a property owner be unable, permanently, to use his property for any of the permitted purposes and is therefore deprived of all beneficial use thereof and has been refused a variation by an administrative board in the exercise of a discretion which the zoning ordinance has conferred upon it, he may successfully attack the validity of the ordinance as a taking of his property without compensation. . . . In the instant case, the appellant, we think, *met the heavy burden placed upon a property owner and proved by clear and convincing evidence that he would be deprived of all reasonable use of his property,* if the provisions of the present zoning ordinance, as they relate to the *use* of the property, are applicable to it . . . ." (Emphasis supplied.) 223 Md. at 103-04.

*See also Mayor and Council of Rockville v. Stone,* 271 Md. 655, 319 A. 2d 536 (1974); *Pallace v. Inter City Land Co.,* 239 Md. 549, 212 A. 2d 262 (1965); *DePaul v. Board,* 237 Md. 221, 205 A. 2d 805 (1965); *Pahl v. County Bd. of Appeals,* 237 Md. 294, 206 A. 2d 245 (1965).

In *Stevens v. City of Salisbury, supra,* we again addressed the problem of a taking of property in the context of regulation under the police power. There, the appellants were owners of corner properties located at intersections of streets in Salisbury. Section 42 of that city's zoning ordinance provided, in §§ 1, 2 and 3, that "barriers" for a distance of 25 feet along the front and side lot lines of corner properties be limited to a height of three feet above the established elevation of the nearest curb, and that all such structures within the area formed by connecting the ends of the respective twenty-five foot distances be similarly limited to an elevation of three feet above the curb level. Subsection 4 required that within such areas, the ground elevation of

terraced front yards not exceed three feet above that curb level, and subsection 5 provided that within two years from the passage of the ordinance, all barriers, except buildings and tree trunks cleared of limbs hanging below a distance of eight feet above the curb, be removed.

We construed §§ 1, 2 and 3 to be prospective and valid regulations not constituting a taking. We said:

> "This Court stated in *Lipsitz v. Parr*, 164 Md. 222, 234: 'The court has lately had for consideration the relation of the constitutional protection of property to the police power, with the result that it is now established that *reasonable regulation, which is not confiscatory, but which leaves the owner in substantial enjoyment of his property, although diminishing its value through the restriction of its use, is valid without compensation.*' The distinctions between a taking for which compensation must be made and a taking by regulation under the police power are largely distinctions in degree.... But in order to be compensable, the damage resulting from the restriction must be '*substantial*,' *United States v. Cress*, 243 U. S. 316, 328, *United States v. Causby*, *supra*, 328 U. S. 256, 266, *and constitute 'severe interferences which are tantamount to deprivations of use or enjoyment of property.*'"[5] (Emphasis supplied.)
>
> 240 Md. at 567.

We held that considering all of the attendant

---

5. Our reliance on *Lipsitz* makes it clear that this test is consistent with the general rule in zoning cases that property must be deprived of all reasonable use and that a mere substantial impairment of enjoyment through a substantial diminution in value is not enough to constitute a taking. In *Lipsitz*, we noted at 234:

"A confiscatory [zoning] regulation, such as is illustrated by the case of *Nectow v. City of Cambridge*, 277 U. S. 183, 48 S. Ct. 447, 72 L. Ed. 842, where the regulation denied to the land every use but one, and that without value, would, however, be equivalent to taking and be invalid without compensation. The difference between taking and regulation may therefore be one of degree...."

circumstances "especially the comparatively small portions of the properties to which the restrictions apply," §§ 1, 2 and 3 were not confiscatory as the owners were left " 'in substantial enjoyment of their properties,' " and that the damages resulting from the restrictions were not " 'substantial' in character," and did not constitute " 'severe interferences which are tantamount to deprivations of use or enjoyment of property.' "

We held, however, that §§ 4 and 5 constituted takings in requiring property owners to destroy or reduce their property at their own expense. We said at 569:

> "As we view the situation, it is a very different thing for government to say to a property owner that you must refrain from exercising certain ordinarily permissible rights upon a relatively insignificant segment of your property to subserve a real public need (subsections 1, 2, and 3) than to require that owner to destroy, reduce, and/or remove, at his individual expense, his own property, possibly to avert the necessity of erecting, at public expense, a stop sign or other traffic signal (subsections 4 and 5). When government does the former, it is acting in the realm of regulation; when it does the latter it is traveling in the territory of a 'taking.' The former is a clear illustration of what the Supreme Court of Washington meant when it said . . . [in *Ackerman v. Port of Seattle*, 348 P.2d 664] 'when private property rights are actually destroyed through the government action, then police power rules are *usually* applicable,'. . . ."

Thus in *Stevens*, we again recognized the principle articulated in *Mahon* that regulation through the police power, *though usually not* requiring compensation, may amount to a taking.

In *Potomac Sand & Gravel Co. v. Governor, supra*, Potomac claimed that a statute making it unlawful to dredge for sand, gravel or other aggregates or minerals, in any of the tidal waters or marshlands of Charles County,

constituted an unconstitutional taking of their property. Potomac was engaged in the business of dredging sand and gravel found in land owned by it in Charles County and from the beds of tidal waters surrounding such land. Three parcels of land were involved in the suit — all were adjoined or surrounded by State wetlands.

Summarizing the Maryland law concerning riparian rights and rights to sand and gravel, we said that under common law the riparian owner could not take sand and gravel from the waterfront or shore of his land below the high water mark, or grant that right to another; that such dredging had been prohibited and permitted at various times and in differing degrees in this State by statute; and that the statute in question prohibited such dredging in the manner in which the Legislature then deemed necessary to protect the public welfare. We then considered the question whether the regulation was a taking of Potomac's property in violation of the federal and state constitutions. We stated at 370:

> "In due process questions in which there is an alleged taking without compensation, the first consideration is whether the statute is a taking by eminent domain requiring compensation, or a regulation of use under the State police powers."

We turned to *Goldblatt* for guidance on the question, saying:

> "In *Goldblatt*, the Court held that eminent domain was inapplicable. Citing *Mugler v. Kansas* . . . [*supra*], the Court said that a prohibition simply upon the use of a property for purposes that are declared by valid legislation to be injurious to health, morals or safety of the community, cannot be deemed a taking or an appropriation of property for public benefit. The Court went on to say that the owner could continue to use his property lawfully and that the owner could sell his property. The Court admitted that there were possible situations where regulation is so severe that it constitutes a taking, but that the burden is on the

challenger of the statute, and the burden had not been met."
266 Md. at 370-71.

We held that the statute was a limitation "upon a use of a property, [and] not a taking," and that it was a valid exercise of the police power under the test articulated by the Supreme Court in *Lawton v. Steele*, 152 U. S. 133, 14 S. Ct. 499, 38 L. Ed. 385 (1894). That case set forth the rule that to justify a regulation under the police power: (1) the interest of the public generally as distinguished from those of a particular class must require the regulatory interference; (2) that the means chosen are reasonably necessary for the accomplishment of the purpose; and (3) that the means are not unduly oppressive upon the individual. We rejected Potomac's argument that the statute was unduly oppressive because it restricted its right to conduct a lawful business and denied it, as owner in fee, of the use of non-tidal lands and marsh for the dredging of sand and gravel. We observed that all of the proposed dredge sites except for 30 per cent of one 300-acre tract were State wetlands and could be regulated since riparian rights unexercised prior to legislative revocation were not entitled to constitutional protection. We held that the loss of 30 per cent of potential sand and gravel on the tract above the high water mark was not of sufficient magnitude to invalidate the statute under the police power.[6]

## II

We think the statutory prohibition of the open-pit or strip method of mining coal constitutes reasonable regulation under the State's police power calculated to protect the environment and to preserve State-owned land for public use for present and future generations of citizens. Undoubtedly, the Legislature determined that the reclamation and revegetation procedures heretofore required of strip mining operators (See Article 66C, § 663, *et*

---

6. It was questionable whether there was any such loss since there was evidence that access to such area could be gained from the land side.

*seq.*) did not adequately protect the public interest from the ravages visited upon State-owned land by open-pit mining methods. Under the test of *Lawton v. Steele, supra,* which we adopted in the *Potomac* case to determine whether a statutory regulation was a limitation upon the use of property, and not a taking, we think the Legislature could constitutionally conclude that the interest of the public generally required the regulatory interference mandated by Chapter 355 and that the means chosen were reasonably necessary to accomplish the legislative purpose. On the record before us, however, we cannot satisfactorily determine whether Chapter 355 was unduly oppressive upon George's Creek and Buffalo and was confiscatory within the principles of the cases heretofore set forth, and particularly the Supreme Court cases of *Mahon* and *Goldblatt* and our own cases of *Potomac, Borinsky,* and *Stevens.* The statute prohibits only the mining of coal by the strip or open-pit methods; the mineral rights reserved by George's Creek include, in addition to coal, the right to clay, gas, oil and other minerals underlying the McMillen tract. Buffalo's rights, insofar as this case is concerned, are limited to the extraction of coal from the McMillen tract. Granted that the burden to show confiscation was upon the appellees, and that it was a heavy one, not satisfied by merely showing economic hardship, or substantial diminution in the value of their property, or even a deprivation of its most beneficial use, the testimony with respect to the existence of gas, oil, clay and other minerals on the McMillen property, other than coal, was so general and lacking in specifics as to make its intelligent evaluation difficult, if not impossible. George's Creek's president testified that no surveys had been conducted on the McMillen tract to determine the existence of oil or gas or fire-clay on the property. Zachar had no knowledge concerning the existence of oil or gas on the property. That gas fields had been discovered "in the area" according to other evidence in the case suggests the possibility that the gas and oil rights on the McMillen tract might be of a value far greater than the $1 per acre per year leases outstanding on the property. As to the existence of

other minerals on the tract, Zachar's testimony that there were none of value was so lacking in detail and "bare-boned" as to constitute an opinion of little substance. Throughout the trial, the testimony of the witnesses with respect to George's Creek's mineral rights and Buffalo's strip mining operations ranged far beyond the rights reserved and leased in the McMillen tract, that being the only property upon which there was evidence affirmatively establishing that George's Creek had a reservation of mineral rights. Nor was there evidence which would permit a finding of the effect of the prohibition on the usefulness of the land as a whole. It may be appropriate to consider that effect. In his dissenting opinion in *Pennsylvania Coal Co. v. Mahon, supra,* Mr. Justice Brandeis said, at 419:

> "If we are to consider the value of the coal kept in place by the restriction, we should compare it with the value of all other parts of the land. That is, with the value not of the coal alone, but with the value of the whole property. The rights of an owner as against the public are not increased by dividing the interests in his property into surface and subsoil. The sum of the rights in the parts can not be greater than the rights in the whole. The estate of an owner in land is grandiloquently described as extending ab orco usque ad coelum. But I suppose no one would contend that by selling his interest above 100 feet from the surface he could prevent the state from limiting, by the police power, the height of structures in a city. And why should a sale of underground rights bar the state's power? "

We think the interests of justice require that we remand this case, pursuant to the provision of Maryland Rule 871 a for the taking of additional evidence bearing on the question whether, in the circumstances, the effect of Chapter 355, as it applies to appellees here, is of such magnitude as to constitute a taking of property for which just compensation must be paid. *Goldblatt v. Town of Hempstead, supra; Pennsylvania Coal Co. v. Mahon, supra; Potomac Sand &*

*Gravel Co. v. Governor, supra.* On remand, the parties should be afforded an opportunity to amend the pleadings to bring into issue all State-owned land upon which George's Creek and Buffalo hold rights to extract coal and other minerals from the subsurface and to reassert all constitutional and other issues not reached in the proceedings below and not herein decided. Upon the filing of our mandate (Rule 876), Buffalo must immediately terminate its strip mining operations on State-owned land except for those operations authorized prior to July 1, 1973 by Permit No. 161. It should be clearly understood that we do not now decide whether the application of Chapter 355 to these appellees was a proper regulation of land use, or was a taking for which the constitution requires compensation. If, on remand, the trial judge concludes that the property of either George's Creek or Buffalo has been taken or confiscated as a result of Chapter 355, compensation therefor may well have to be paid on values established as of July 1, 1973.

> *Case remanded without affirmance or reversal pursuant to the provisions of Maryland Rule 871 a for further proceedings in accordance with this opinion; costs to abide the result.*