# Staunton

RICHARD L. MEAGHER, ET AL. v. APPALACHIAN ELECTRIC POWER COMPANY, A CORPORATION.

September 10, 1953.

Record No. 4101.

Present, Eggleston, Spratley, Buchanan, Miller and Whittle, JJ.

The opinion states the case.

*Dodson & Pence, Earl A. Fitzpatrick* and *Jack B. Coulter,* for the appellants.

*Woods, Rogers, Muse & Walker,* for the appellee.

EGGLESTON, J., delivered the opinion of the court.

This is an appeal from a final decree sustaining a demurrer to and dismissing the bill of complaint filed by Richard L. Meagher and others, hereinafter called the plaintiffs, against the Appalachian Electric Power Company, hereinafter called the defendant, seeking alternative relief against the defendant for the erection of high-voltage transmission towers on certain lots owned by it, which erection the plaintiffs claimed was in violation of the restrictive covenants binding on the lands of the plaintiffs and the defendant. The plaintiffs sought either to have the defendant corporation enjoined from using its property for other than residential purposes, or alternatively, to require it to exercise its privilege of eminent domain with respect to the alleged property rights of the plaintiffs.

The principal allegations of the bill may be summarized thus: The plaintiffs, Richard L. and Laura A. C. Meagher, W. Earl Allen, Jr., and Mildred H. Allen, and Charles S. Patton, Jr., and Frances S. Patton, are fee simple owners of certain lots of land lying in an "exclusively residential" subdivision known as "Grubb Land Development" in Roanoke county, just west of the city of Roanoke. The Meaghers and the Allens acquired their properties in 1948, and the Pattons acquired theirs in 1951.

Prior to 1950 another of the plaintiffs, Herman Weaver, acquired certain lots in a similar residential development known as "Crestmoor," which is adjacent to and immediately south of the Grubb Land Development.

The deeds whereby these several properties were conveyed were expressly made subject to certain covenants, conditions and restrictions, which by recorded instruments had been imposed on and ran with all of the lands in the two subdivisions for a period of fifty years from January 1, 1946. Among the covenants and restrictions were these:

"All persons who shall acquire any land described in this deed shall take and hold the same, and agree and covenant with the proprietors of said land, and their assigns and each of them, to conform to and observe the following restrictions and conditions as to the use thereof. * * *

   \*      \*      \*      \*      \*      \*      \*

"(2) No portion of the land hereby conveyed shall be improved or occupied for other than residential purposes, and no flat, apartment house, trailer, or temporary living quarters shall be erected thereon.

   \*      \*      \*      \*      \*      \*      \*

"(6) No intoxicating liquors shall be sold on any of the premises hereby conveyed, nor shall any cows, hogs, or sheep be kept thereon; nor shall any noxious or offensive trade be carried on upon any lot, nor shall anything be done thereon which may be or become a nuisance to the neighborhood."

In April, 1950, the Appalachian Electric Power Company purchased from Marcia Johnston and Robert L. Brown, respectively, certain lots in the Grubb Land Development, and in March and April, 1950, it acquired from H. G. Cole, Jr., Olen F. Levell, Jr., and Lawrence D. Johnson certain lots in the Crestmoor subdivision. Whether the several deeds by which these properties were acquired were expressly made subject to the covenants and restrictions which had been imposed on the lands is not disclosed in the bill. However, it is alleged that the defendant took the several properties with constructive notice of the covenants and restrictions which had been expressly incorporated in prior deeds in the defendant's chains of title, and that hence its acquisition of the property was subject thereto.

The plaintiffs, T. J. and Nellie G. Orander, Robert P. and Maude M. Grogan, Florence L. John, Lake L. Newton, and George W. and Miriam B. Parsons, are the owners of properties in a residential district known as "Belle Air" subdivision, which lies immediately to the east of the Grubb Land and Crestmoor subdivisions. The bill alleges that these Belle Air owners acquired their properties by deeds which were expressly subject "to the identical covenants, restrictions and conditions applying to the Crestmoor subdivision."

The plaintiffs, J. Kyle Montague and Lucy M. Montague, are the former owners of the property in the Grubb Land subdivision now owned by the Pattons, having conveyed it to them in May, 1951, and after the defendant had acquired its properties in the vicinity.

The bill alleges "That relying upon the residential character of this area as assured by the aforesaid several separate sets of restrictions, covenants and conditions, which being equitable servitudes enured to their benefit and thereby constituted vested property rights, the complainants at great cost and expense planned for" and constructed their respective residences.

It is further alleged that in violation of the "duly recorded covenants, restrictions and conditions" binding upon

the lands which the defendant had acquired in these subdivisions, and over the protest of the plaintiffs, the defendant has erected "for commercial use" "a large, unsightly, obnoxious and dangerous steel tower," standing over 100 feet high, "with three crossarms and seven high-voltage transmission lines," on the lot in the Grubb Land subdivision which it acquired from Marcia Johnston, and a similar tower on the lot in the Crestmoor subdivision which it acquired from Lawrence D. Johnson, and has announced its plan to erect similar towers, and for the same purpose, on the other lots which it owns in these subdivisions. These acts of the defendant, it is alleged, have the effect of "greatly detracting from the value of the general area as an exclusively residential district," constitute a violation of "the vested property rights" of the plaintiffs which had been secured to them by such restrictions, and a taking and damaging of their properties without due process of law.

There is no allegation that any of the defendant's structures have been located or are planned to be located on, or that any of its transmission lines will cross over, any of the lots located in the Belle Air subdivision.

The prayer of the bill is in the alternative, that the defendant corporation "be enjoined from using its property for other than residential purposes and be required to conform with and abide by the restrictions, covenants and conditions applying to its lands;" or, if injunctive relief be denied, "that the defendant corporation then be ordered to exercise forthwith its privilege of eminent domain with respect to the rights" of the plaintiffs, as required by law.

In its demurrer, which was sustained, the defendant advanced these propositions: (1) The use of its property for the purpose stated does not violate any of the restrictive covenants which attached thereto; (2) The plaintiffs' rights in the restrictive covenants are not "property" within the meaning of section 58 of the Constitution and the laws of the State, with respect to the taking and damaging of property for public uses; (3) No element of damage compensable under the Constitution and the laws of the State is alleged;

(4) The several plaintiffs whose properties are located in the Belle Air subdivision have no enforceable interest in the alleged breach of the Grubb Land and Crestmoor restrictions, nor has any of their property been taken or damaged within the meaning of the Constitution and the laws of the State; (5) Neither the Montagues nor Pattons have any rights in law or in equity to the relief sought, the Montagues having sold their interest in the property, and the Pattons having acquired it with full notice and knowledge of the defendant's intended use thereof.

In its written opinion the trial court found it unnecessary to pass upon the first point raised by the demurrer, but sustained the others.

We are of opinion that the use and intended use by the defendant of its lands in erecting the steel transmission towers thereon violate the covenants, restrictions and conditions applying to the lands. It is plain that the clear intent of those who imposed the restrictions was to assure that the area be used exclusively for residential purposes. By the terms of the covenants and restrictions "all persons who shall acquire any land" in the subdivisions were to "take and hold the same," and agreed "to conform to and observe" the recited "restrictions and conditions as to the use" of the lands. One of the covenants is that "No portion of the land * * * shall be *improved or occupied for other than residential purposes, * * * ."* (Italics supplied.) The restriction is on both the nature of the improvement, that is, the type of structure to be erected on the land, and the use or occupancy of the property. Both are confined to "residential purposes." Manifestly, the erection of a 100-foot steel tower to support high-voltage transmission wires is both an improvement and occupancy "for other than residential purposes."

The covenants here are quite different from those in *Stokely* v. *Owens*, 189 Va. 248, 52 S. E. (2d) 164, upon which the defendant relies. There the type of construction was limited to a residence, with an additional covenant that "no noxious or offensive trade or activity" should be

carried on upon the property. We held that these restrictions, read together, did not exclude a commercial business conducted in a residence unless it were "noxious or offensive." Here the restriction, as has been observed, excludes both the type of improvement and use of the property "for other than residential purposes."

The next question is whether the restrictive covenants applicable to all of the lots in the subdivisions are a property right in favor of those for whose benefit they were imposed. The precise question has not heretofore been presented to this court and the decisions from other jurisdictions are in conflict. In the recent case of *City of Raleigh* v. *Edwards,* 235 N. C. 671, 71 S. E. (2d) 396, there is a clear and concise discussion of the subject. There the city of Raleigh instituted condemnation proceedings to acquire property in a subdivision for the erection of a water tower. Several property owners in the subdivision intervened and asserted the claim that the proposed public improvement was in violation of the covenants restricting the use of the property in the subdivision to "private dwelling purposes only," and would deprive them of vested property rights of substantial value created by such covenants, and entitle them to compensation therefor. After a careful review of the authorities the court thus expressed its agreement with that view:

" * * * the decided weight of authority in other jurisdictions supports the proposition that such a restriction, being in the nature of an equitable servitude, is an interest in land and must be paid for when taken. The theory is that these restrictions impose negative easements on the land restricted in favor of and appendant to the rest of the land in the restricted area, and when a particular parcel thereof is appropriated for a public use that will violate the restrictions, such appropriation amounts in a constitutional sense to a taking or damaging of property of the other landowners for whose benefit the restrictions are imposed. 18 Am. Jur., Eminent Domain, § 157, p. 788; Annotations: 17 A. L. R. 554; 67 A. L. R. 385; 122 A. L. R. 1464.

"It is true that such other landowners may not enforce the restrictions against the condemnor, but they are nonetheless entitled to an award of compensation 'where, through the exercise of the power of eminent domain, there is a taking or damaging of such property rights * * * .' 18 Am. Jur., Eminent Domain, § 157, p. 788. * * * " (71 S. E. (2d), at page 401.)

The North Carolina court declined to follow the minority view which, it said, "is grounded on the theory that these restrictions, being contractual rights enforceable in equity only between parties in privy, do not constitute an interest in property at all." (71 S. E. (2d), at page 401.)

Among other authorities taking the majority view are, *Ladd* v. *City of Boston*, 151 Mass. 585, 24 N. E. 858, 21 Am. St. Rep. 481 (opinion by Holmes, J.); *Riverbank Improvement Co.* v. *Chadwick*, 228 Mass. 242, 117 N. E. 244, L. R. A. 1918B, 55; *Johnstone* v. *Detroit, etc. R. Co.*, 245 Mich. 65, 222 N. W. 325, 67 A. L. R. 373; *Peters* v. *Buckner*, 288 Mo. 618, 232 S. W. 1024, 17 A. L. R. 543; *Flynn* v. *New York, etc. R. Co.*, 218 N. Y. 140, 112 N. E. 913, Ann. Cas. 1918B, 588. See also, Nichols' The Law of Eminent Domain, 3d ed., Vol. 2, § 5.73, pp. 81-84.

A leading case presenting the minority view is *Anderson* v. *Lynch*, 188 Ga. 154, 3 S. E. (2d) 85, 122 A. L. R. 1456, where the principal authorities relied upon by the defendant here are collected.

Our previous decisions have clearly indicated that restrictive covenants create a valuable right in property. In *Spilling* v. *Hutcheson*, 111 Va. 179, 183, 68 S. E. 250, we approved the statement in 4 Pomeroy's Equity Jur., 3d ed., § 1342, that "restrictive covenants in deeds * * * limiting the use of land in a specific manner, or prescribing a peculiar use, * * * create *equitable servitudes* on the land." (Italics supplied.)

In *Cheatham* v. *Taylor*, 148 Va. 26, 39, 138 S. E. 545, we said "that the right of a third person to the protection of the [restrictive] covenant is an *equitable right* by whatever name called." (Italics supplied.)

In *Springer* v. *Gaddy*, 172 Va. 533, 541, 2 S. E. (2d) 355, 358, we approved the holding that the right under such a restrictive covenant is "a negative easement." But whatever may be its correct designation, we are of opinion that such restrictive covenants create an "interest or estate" in land, which a public utility may acquire by eminent domain (Code, § 25-8), but subject to the protection of section 58 of the Constitution that it may not "be taken or damaged for public uses, without just compensation."

It is argued that such restrictions cannot be invoked against a public service corporation clothed under the laws of the State with the power of eminent domain, because public necessity may require the taking of property in such an area despite such restrictions. The answer is, that " 'Public necessity may justify the taking, but cannot justify the taking without compensation.' " *City of Raleigh* v. *Edwards*, *supra*, 71 S. E. (2d), at page 399.

We are of opinion, then, that the acts of the defendant are a breach of the covenants and restrictions binding on its lands in these subdivisions, and constitute a taking or damaging of property rights for which compensation must be paid.

Injunction is the proper remedy to prevent the taking or damaging of private property for a public use without just compensation by one who is invested with the power of eminent domain. *Virginia Hot Springs Co.* v. *Lowman*, 126 Va. 424, 437, 101 S. E. 326; *Nichols* v. *Central Va. Power Co.*, 143 Va. 405, 413-415, 130 S. E. 764, 44 A. L. R. 727; 30 C. J. S., Eminent Domain, § 405, p. 125.

Our next inquiry is, which of the plaintiffs are entitled to relief? Clearly, under the view we have taken of the matter, the Meaghers and Allens who acquired their property in the Grubb Land Development, and Weaver who acquired his in the Crestmoor subdivision, subject to the stated restrictions, prior to the time the defendant acquired any of its properties in these subdivisions, are entitled to relief, and the lower court erred in sustaining the demurrer as to their claims in the bill.

The lower court held in its written opinion that the Pattons, who acquired their property in the Grubb Land Development after the defendant had acquired its properties in that and the adjacent subdivision, "have no right in equity to enjoin the defendant corporation in the use being made of its property since they have suffered no damage."

It is well settled that "The right to enjoin the breach of restrictive covenants does not depend upon whether the covenantee will be damaged by the breach; the mere breach is sufficient ground for interference by injunction." 14 Am. Jur., Covenants, etc., § 339, p. 666. See also, Pomeroy's Equity Jur., 5th Ed., Vol. 4, § 1342, p. 942.

But aside from this, the taking or damaging of the property rights occurred at the time the defendant began the improvement or occupancy of its property "for other than residential purposes," in violation of the restrictions, and since this was after the Pattons had acquired their property they are among the plaintiffs who are entitled to relief.

Nor is it a sufficient defense to say, as the defendant argues, that the Pattons are not entitled to relief because they purchased their property with full notice of the defendant's intended use of its properties. If this argument were sound, compensation for property taken or damaged in an eminent domain proceeding might be avoided by a mere showing that the owner acquired it after notice that it might be necessary that it be taken for public use, a manifestly unjust result.

Consequently, we are of opinion that the lower court erred in sustaining the demurrer to the claims asserted in the bill by the Pattons.

■ The lower court further held that the Montagues, having sold their property to the Pattons, "have no right in equity to enjoin the defendant corporation for the alleged violations of the restrictive covenants," but if they have "suffered any loss in the sale of their lot by reason of the alleged violations," "their remedy, if any, is an action at law for damages."

In their brief counsel for the Montagues admit that there is doubt as to their right to injunctive relief (14 Am. Jur., Covenants, etc., § 310, p. 651), but say that these former owners were made parties plaintiff to recover damages which they suffered in having sold their property "at a greatly reduced price," due to "the depreciation in value caused by the [defendant's] erection of the first tower."

There are two answers to this argument. In the first place, there is no allegation in the bill that the Montagues sold their property at a "greatly reduced price" because of the acts of the defendant. The only allegation is that the Montagues are the "former owners" of the property which they have sold to the Pattons. Next, if it be a fact that these plaintiffs have suffered damage by reason of the defendant's breach of the covenants and restrictions they have an adequate remedy at law, as the trial court held. 14 Am. Jur., Covenants, etc., § 34, p. 511; 21 C. J. S., Covenants, § 114, pp. 982, 983. Hence, we conclude that the lower court was right in sustaining the demurrer as to the claims of the Montagues asserted in the bill of complaint.

The final inquiry is whether the plaintiffs, the Oranders, Grogans, Parsons, John and Newton, the owners of properties in the Belle Air subdivision, have stated a case for relief against the defendant corporation. As has been said, there was no allegation that the defendant has located or is planning to locate any of the structures on, or that any of its transmission lines will cross over, any of the lots located in the Belle Air subdivision. The lower court held that these plaintiff property owners "have no right in equity to enjoin the defendant corporation for the alleged violation of the restrictive covenants since there is no privity of contract. * * * It is well settled that the lot owners of one subdivision have no right to enforce the restrictive covenants of another and separate subdivision."

It is true, as these plaintiffs argue, that the right of enforcement of such restrictive covenants depends not upon privity of contract, but upon the intention of the parties imposing them. "Whether or not third persons, not parties

to the instrument, are within its purview, is one of intention, and this intention may appear either from the instrument alone, or from the instrument with the aid of the surrounding facts and circumstances. * * * If a person is within the benefits intended to be conferred, he has an equitable interest which a court of equity will protect." *Cheatham* v. *Taylor, supra,* 148 Va., at page 34. See also, 14 Am. Jur., Covenants, etc., § 311, pp. 651, 652. Moreover, in this State a restrictive covenant for the benefit of a third party may be enforced in his own name under Code, § 55-22. *Cheatham* v. *Taylor, supra,* 148 Va., at page 46.

Although these plaintiffs argue that the restrictions imposed on the Grubb Land and Crestmoor subdivisions were for the benefit of the owners of property in the Belle Air subdivision, there is no such allegation in the bill. The only allegation is that the lots in the Belle Air subdivision are "subject, for the most part, to the identical covenants, restrictions and conditions applying to the Crestmoor subdivision."

We have been pointed to no authority, nor have we been able to find any, to sustain the contention that, irrespective of mutual covenants designed for the purpose between adjoining property owners, restrictive covenants binding on property in one subdivision are for the benefit of, or may be enforced by, property owners in an adjoining subdivision subject to like restrictions. As to the effect of mutual covenants between owners of adjoining lands, see 26 C. J. S., Deeds, § 167-d, pp. 560-1.

Furthermore, the bill alleges that the Grubb Land Development restrictions were imposed by the owners "to insure the residential character of *their respective properties.*" (Italics supplied.) Again, the Crestmoor restrictions expressly provide that "it shall be lawful for any other person or persons owning any other lot or lots *in said development or subdivision* to prosecute any proceedings at law or in equity against the person or persons violating or attempting to violate any such covenant or restriction." (Italics supplied.) Such allegations negative an intention that the restrictions

imposed on the Grubb Land Development and Crestmoor properties were intended to be for the benefit of property owners in any other subdivision.

We are of opinion, then, that the lower court was right in sustaining the demurrer as to the claims of the plaintiffs who own properties in the Belle Air subdivision.

So much of the decree appealed from sustaining the demurrer to the claims of the plaintiffs, the Montagues, Oranders, Grogans, Parsons, John, and Newton, is affirmed. That portion of the decree which sustains the demurrer to the claims of the plaintiffs, the Meaghers, Allens, Pattons and Weaver, is reversed and the cause remanded for further proceedings in conformity with the views here expressed.

*Affirmed in part;*
*Reversed in part and remanded.*