470 A.2d 813

The WASHINGTON SUBURBAN SANITARY COMMISSION

v.

**Morris FRANKEL, et al.**

**No. 369, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

Feb. 3, 1984.

Certiorari Granted June 7, 1984.

420

Carl Harrison Lehmann, Upper Marlboro, with whom was Henderson J. Brown, Hyattsville, on brief, for appellant.

David H. Bamberger, Baltimore, with whom was E. Fremont Magee, Baltimore, on brief for appellee, The Singer Company.

Gerald W. Heller, Washington, D.C., with whom were Aaron L. Handleman, Finley, Kumble, Wagner, Heine, Underberg, Manley & Casey, Washington, D.C., on brief for appellees, Computer Entry Systems Corp., Phillips, Blackburn, Cross and Peterson.

Argued before GARRITY, ADKINS and BLOOM, JJ.

ADKINS, Judge.

The question presented in this case is whether an equitable servitude or negative easement created by a restrictive covenant is a property interest for which just compensation must be paid when the servitude or easement is extinguished by condemnation of the land that is subject to it.[1] The question arises in the following factual context:

In 1956, Contee Sand & Gravel Company, Inc. owned and operated as a mining facility a 385 acre tract of land in Montgomery County, near the Prince George's County line. Apparently in order to obtain a renewal of its mining special exception, Contee proposed that the mining operation continue for a limited period of time, after which the land would be developed as an industrial park. By declarations properly recorded on October 11, and December 11, 1956, and pursuant to a general or common scheme of development, Contee and Francis S. Carnes subjected 347.4368 acres of the

---

1. Art. III, § 40 of the Maryland Constitution provides: "The General Assembly shall enact no law authorizing private property to be taken for public use without just compensation...." See also United States Constitution, Amendment V, applicable to the States through Amendment XIV, "... nor shall private property be taken for public use, without just compensation."

tract to a variety of restrictive covenants. For purposes of this appeal, pertinent covenants provide that:

No waste material or refuse may be dumped or permitted to remain in or upon any part of the property outside of buildings.

\* \* \* \* \* \*

No emission of objectionable odors outside the lot lines shall be permitted, except during periods when breakdown of equipment occurs such as to make it evident that the emission was not reasonably preventable.

Additionally, the covenants prohibit use of the land as a "[d]ump or sanitary landfill." Taking the declarations as a whole, we think it fair to say that they were and are intended to encourage the construction of attractive and appropriately-located improvements, control undesirable aspects of industrial development, and in general provide for a high-quality industrial park.

As to the beneficiaries of these extensive and comprehensive restrictive covenants, each declaration in pertinent part provided:

WHEREAS Grantor is the owner of the real property described in . . . this Declaration, and is desirous of subjecting the real property [so] described . . . to the conditions, covenants, restrictions, reservations and easements hereinafter set forth, each and all of which is and are for the benefit of said property and for each owner thereof, and for the benefit of adjacent properties and properties in the general neighborhood and each owner thereof and shall inure to the benefit of and pass with said hereafter described property of Grantor and each and every parcel thereof and shall inure to the benefit of and pass with said adjacent property and properties and properties in the general neighborhood and each and every parcel thereof and shall apply to and bind the successors in interest and any owner thereof.

In 1980, appellant WSSC condemned some 151.48 acres of the industrial park and presently uses its property for the

storage and processing of sewage sludge. This tract is known as Site 2. There seems to be no dispute that this activity violates the restrictive covenants, or would do so were the activity conducted by a private party. Aside from the covenants prohibiting dumping and maintenance of waste material outside of buildings, the record contains ample evidence that the composting sludge emits highly objectionable odors "outside the lot line."

Also in 1980, prior to the conclusion of the condemnation proceedings, appellees Phillips, Peterson, Cross, and Blackburn, filed an equity suit in Prince George's County seeking, *inter alia,* a declaration that the restrictive covenants imposed on Site 2 by the previously-mentioned declarations were property interests of the plaintiffs which prohibited the intended (and now existing) public use by WSSC. Each complainant was alleged to be a resident of property adjacent to or in the general neighborhood of the industrial park. Subsequently, appellees Chesapeake and Potomac Telephone Company of Maryland and Erie Indemnity Company were permitted to intervene in this suit as plaintiffs. The two corporations were (and are) owners of land within the industrial park.

The next step in this complex affair was the filing by appellant WSSC of a declaratory judgment action in the Circuit Court for Montgomery County. The principal relief requested was, in effect, a declaration that the restrictive covenants were not compensable property rights. WSSC joined as defendants all the above listed plaintiffs in the Prince George's County suit plus eight other individuals and corporations. The eight new parties all were owners of property within the industrial park, and all are appellees here. Yet other of the present appellees intervened as defendants. A number of the defendants-appellees filed counterclaims against WSSC for damages.

The Prince George's County suit was transferred to Montgomery County and consolidated with the declaratory action pending there. In May 1981, appellee Chesapeake and Poto-

mac Telephone Company of Maryland moved for a separate trial of an issue of law pursuant to Md. Rule 502. The issue posed was:

> That the underlying legal question to be resolved ... is: Under the U.S. Constitution, Maryland Constitution and/or Maryland law are the restrictive covenants ... on Site 2 compensable property rights of the parties benefited or intended to be benefited thereby, ... which ... (WSSC) must acquire by condemnation before it can use Site 2 for a sludge composting facility which will violate or breach those covenants?

Although WSSC proposed a number of other issues to be determined, on August 11, 1981, Judge John McAuliffe granted the motion.

On December 8, 1982, Judge Mitchell answered the issue in a written memorandum and order holding in substance that the appellees' restrictive covenants or negative easements were compensable property interests. This disposed of WSSC's request for declaratory relief, although it did not dispose of all the claims pending before the court. On January 26, 1983, Judge Mitchell signed an order pursuant to Md. Rule 605 a. He found there was no just reason for delay and entered final judgment in favor of appellees and against WSSC on WSSC's claim for declaratory relief.

From that judgment WSSC appealed. We return, therefore, to consideration of the issue defined at the outset of this opinion.

*Restrictive Covenants as Compensable Property Rights*

█ The power of eminent domain is a prerogative of sovereignty and would exist in Maryland even without the sanction of the Constitution. *Riden v. Philadelphia, B. & W. R.R. Co.,* 182 Md. 336, 35 A.2d 99 (1943); *Moale v. Baltimore,* 5 Md. 314 (1854). Art. III, § 40 of the Maryland Constitution (footnote 1, *supra* ) is not, therefore, a grant of power, but a limitation on the exercise of the power of eminent domain. *Riden v. Philadelphia, B. & W. R.R. Co., supra.*

The limitation imposed by that section is that private property may not "be taken for public use without just compensation...." The Fifth Amendment to the United States Constitution imposes a similar limitation, as do the constitutions of all of the states except for North Carolina. E. Spies & J. McCoid "Recovery of Consequential Damages in Eminent Domain" 48 Va.L.Rev. 437, 441 (1962). Even in the absence of a state provision for compensation, such a requirement would be imposed by virtue of the Fourteenth Amendment. *Chicago, Burlington and Quincy R.R. Co. v. Chicago,* 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897); *Baltimore v. Concord Baptist Church, Inc.,* 257 Md. 132, 140–41, 262 A.2d 755 (1970).[2]

■ It is within this constitutional framework that we must decide whether appellant WSSC must compensate appellees, or any of them, because it has condemned land subject to restrictive covenants in favor of land owned by the appellees, and uses the condemned land in a way that violates those restrictions. This question, not previously answered in any reported appellate decision in Maryland, in turn requires us to determine whether a restrictive covenant or negative easement is "property" which is "taken" when the land burdened by it is acquired through the power of eminent domain. *Adaman Mutual Water Co. v. United States,* 278 F.2d 842, 845, (9th Cir.1960) (quoting from *United States v. General Motors Corp.,* 323 U.S. 373, 377–80, 65 S.Ct. 357, 359–60, 89 L.Ed. 311 (1945)).

Ever since the leading English case of *Tulk v. Moxhay,* 2 Phill. 774 (1845) it has been recognized that a restrictive covenant prohibiting certain uses of land (the servient tene-

---

**2.** Because both the Fifth Amendment and Art. III, § 40 of the Maryland Constitution contain identical prohibitions against the taking of private property for public use without just compensation, federal decisions interpreting the former provision are helpful in interpreting the latter, and in the case of decisions of the Supreme Court are "practically direct authority for ... interpretation of the identical provisions in Art. III, § 40...." *King v. State Road Commission,* 298 Md. 80, 84, 467 A.2d 1032, 1034 (1983).

ment) may be enforced in equity by the owner of other land (the dominant tenement) in favor of which the covenant runs. The principle applies in Maryland. *See, e.g. Steuart Trans. Co. v. Ashe,* 269 Md. 74, 304 A.2d ·788 (1973); *Turner v. Brocato,* 206 Md. 336, 111 A.2d 855 (1955); *Raney v. Tompkins,* 197 Md. 98, 78 A.2d 183 (1951); *McKenrick v. Savings Bank of Baltimore,* 174 Md. 118, 197 A. 580 (1938); and *Halle v. Newbold,* 69 Md. 265, 14 A. 662 (1888).

Such restrictive covenants, also described as equitable servitudes or negative easements, are now well-known devices for controlling the use of land by agreement between private individuals, as contrasted to public police powers, such as zoning, which attain the same end. Whether negative easements are property interests attached to the dominant tenement has not been decided in Maryland, although the problem was noted in *Turner v. Brocato, supra,* 206 Md. at 347, 111 A.2d 855. *See also Pollack v. Bart,* 202 Md. 172, 176, 95 A.2d 864 (1953): "An equitable restriction on land has been held to be a property right in the person in favor of whose estate it runs or to which it is appurtenant."

A majority of American jurisdictions that have addressed this question in the context of eminent domain have held that a negative easement is a property interest for the taking of which compensation must be paid when the easement is extinguished by condemnation of the servient tenement. *Adaman Mutual Water Co. v. United States, supra; U.S. v. Certain Land in Augusta,* 220 F.Supp. 696 (D.Me.S.D. 1963); *So. California Edison Co. v. Bourgerie,* 9 Cal.3d 169, 107 Cal.Rptr. 76, 507 P.2d 964 (1973) (overruling *Friesen v. Glendale,* 209 Cal. 524, 288 P. 1080 (1930)); *Stamford v. Vuono,* 108 Conn. 359, 143 A. 245 (1928); *Ladd v. Boston,* 151 Mass. 585, 24 N.E. 858 (1890) (Holmes, J.); *Allen v. Detroit,* 167 Mich. 464, 133 N.W. 317 (1911); *Burger v. St. Paul,* 241 Minn. 285, 64 N.W.2d 73 (1954); *Peters v. Buckner,* 288 Mo. 618, 232 S.W. 1024 (1921); *Horst v. Housing Authority,* 184 Neb. 215, 166 N.W.2d 119 (1969); *Meredith v. Washoe County School Dist.,* 84 Nev. 15, 435 P.2d 750 (1968); *Hayes v. Waverly & P.R. Co.,* 51 N.J.Eq. 345, 27 A. 648 (1893); *Flynn*

*v. N.Y., W. & B. Ry. Co.,* 218 N.Y. 140, 112 N.E. 913 (1916); *Raleigh v. Edwards,* 235 N.C. 671, 71 S.E.2d 396 (1952); *School District No. 3 v. Country Club of Charleston,* 241 S.C. 215, 127 S.E.2d 625 (1962); *Shelbyville v. Kilpatrick,* 204 Tenn. 484, 322 S.W.2d 203 (1959); *Meagher v. Appalachian Elec. Power Co.,* 195 Va. 138, 77 S.E.2d 461 (1953).[3]

This rule has been adopted by the American Law Institute. 5 Restatement Property § 566 (1944). It is supported by other authorities, *e.g. II American Law of Property* (Casner Ed. 1952) § 9.40. It appears to be the rule in England. *The Long Eaton Recreation Ground Co. Ltd. v. The Midland Ry. Co.,* [1902] 2 K.B. 574. And we might add that at least two American jurisdictions in addition to those listed in the preceding paragraph have recognized a negative easement as a property right in condemnation proceedings, but have denied compensation under particular circumstances. *Ashland-Boyd County City-County Health Dept. v. Riggs,* 252 S.W.2d 922 (Ky.1952) (restrictive covenant is property right, but no compensation allowed because proposed governmental use would not violate restrictions); *Fuller v. Town Board of Madison,* 193 Wis. 549, 214 N.W. 324 (1927) (restrictive covenant is property right, but no compensation allowed because of peculiar wording of Wisconsin statute). We note, too, that the United States District Court for the District of Maryland has declined to hold as a matter of law that the beneficiary of a negative easement has no property interest in land subject to the easement and condemned by the government. *United States v. 0.01 Acre of Land,* 310 F.Supp. 1379 (D.Md.1970).

Despite this rather formidable array of authority, WSSC urges us to adopt the minority view which denies compensa-

---

**3.** We have cited what appears to be the leading case in each jurisdiction. Other cases are compiled in Annot. 4 ALR 3d. 1137 (1965). See also G. Kanner "Restrictive Covenants in Condemnation: Bringing Equity into Just Compensation" 1976 Institute on Planning, Zoning and Eminent Domain (Southwestern Legal Foundation) 237; 2 Nichols on Eminent Domain (Rev. ed. 1983) § 5.15; and 5 Powell on Real Property § 679[4] (1981).

tion to the owner of the dominant tenement when land subject to a restrictive covenant is condemned. That position is espoused by *Wharton v. United States,* 153 F. 876 (1st Cir.1907) (affirming *U.S. v. Certain Lands in Jamestown,* 112 F. 622 (CC D.R.I.1899)); *Burma Hills Development Co. v. Marr,* 285 Ala. 141, 229 So.2d 776 (1969); *Arkansas State Highway Comm. v. McNeill,* 238 Ark. 244, 381 S.W.2d 425, 435 (1964); *Smith v. Clifton Sanitation District,* 134 Colo. 116, 300 P.2d 548 (1956) *(semble* ); *Moses v. Hazen,* 69 F.2d 842 (D.C.App.1934); *Board of Public Instruction v. Bay Harbor Islands,* 81 So.2d 637 (Fla.1955); *Anderson v. Lynch,* 188 Ga. 154, 3 S.E.2d 85 (1939); *Doan v. Cleveland Short Line Ry. Co.,* 92 Ohio St. 461, 112 N.E. 505 (1915); *Burke v. Oklahoma City,* 350 P.2d 264 (Okl.1960); *Hospital Service District No. 2 v. Dean,* 345 So.2d 234 (La.App.1977); *Houston v. Wynne,* 279 S.W. 916 (Tex.Civ.App.1925); *but cf. Houston v. McCarthy,* 464 S.W.2d 381 (Tex.Civ.App.1971); and *State ex rel. Wells v. Dunbar,* 142 W.Va. 332, 95 S.E.2d 457 (1956).[4] If non-compensability is the touchstone, despite recognition of a negative easement as a property right, Kentucky and Wisconsin could be added to this list. *See Ashland-Boyd County City-County Health Dept. v. Riggs* and *Fuller v. Madison,* both *supra.*

The minority jurisdictions, like WSSC, advance a number of reasons to support the result they reach—reasons that one commentator suspects are "less the motivation for denial of compensation taken than . . . [rationalizations] for a result desired for other reasons." W. Stoebuck, "Condemnation of Rights the Condemner Holds in Lands of Another" 56 Iowa L.Rev. 293, 306 (1970). Be that as it may, we shall discuss those reasons.

At the outset, we may readily dispose of *Fuller v. Madison,* which turned on the peculiar wording of a Wisconsin statute which has no parallel in Maryland. Additionally, we need give no further attention to *Ashland v. Boyd, supra,*

---

4. For additional cases adopting that view, see the authorities cited in note 3, *supra.*

which found that the proposed public use did not violate the restrictive covenants involved. In the case *sub judice,* it is conceded that WSSC's use of Site 2 violates the covenants applicable to it, or would do so were that use conducted by a private party. The "no-violation" rationale is also the holding of cases like *Wharton v. United States, United States v. Certain Lands* (112 F. 622) and *Moses v. Hazen,* all *supra.* But because those cases include dicta giving other or alternative reasons for the result reached, we shall return to them later.

Some of the minority cases conclude that restrictive covenants entered into between private parties are not intended to apply as against public improvements. Among these are *United States v. Certain Lands, Smith v. Clifton Sanitary District, Moses v. Hazen, Houston v. Wynne,* and *State ex rel. Wells v. Dunbar,* all *supra.* This seems to be a rather strained approach. Comment "Compensation for Abrogation of a Restrictive Covenant by Public Authority." 53 Mich.L.Rev. 451, 456 (1955). There is nothing in the restrictions before us that suggests such an intention. When restrictive covenants are imposed upon a servient tenement, limiting uses of that land in order to enhance the value of one or more dominant tenements, it is unreasonable to find an intention on the part of anyone that the benefit produced by the restrictions are to be totally lost—uncompensated—if a public body acquires the servient tenement. This approach, in fact, appears to be a variation of another reason given to support the minority position: that restrictions, as a matter of public policy, do not apply against the government.[5] Therefore, it is argued, they are void and because they are void, no compensation need be made for their extinguishment.

---

5. Still another reason advanced in some of the cited cases is that since agreements to establish negative easements are entered into subject to existing laws, including the government's right to acquire property by eminent domain, they do not operate when the government exercises that power. But to adopt this argument would be to deny any compensation for property taken by condemnation.

In addition to the cases cited in the preceding paragraph, this view finds support in cases such as *Anderson v. Lynch, Doan v. Cleveland Short Line Ry. Co.,* and *Hospital Service District No. 2 v. Dean,* all *supra.* In essence, these authorities argue that private parties cannot by contract limit governmental exercise of the power of eminent domain; that to hold otherwise would be to place severe economic inhibitions on the exercise of that power; hence, restrictions having that effect are void *ab initio* as against public policy.

The problem with this argument is that it confuses the government's right to use the land condemned free of the restrictions with the government's obligation to pay for property it takes. When the servient tenement is condemned, the restrictions are extinguished, to the extent they purport to restrict the governmental use. They may not be enforced against the government. *Stamford v. Vuono, Horst v. Housing Authority,* II *American Law of Property* § 9.40, 5 Restatement Property § 455, all *supra.* But it is a fallacy to say

> that the requirement that the state compensate the owner of the dominant tenement for the taking of his interest in the servient tenement actually interferes with the exercise of any governmental function .... The governmental agency may not be restrained from making such use of the property as the public purpose for which it is acquired may require, but if that involves the taking of private property, it must make compensation for the same.

*Stamford v. Vuono, supra,* 143 A. at 249. In such a case, "the exercise of the power of eminent domain is no more impaired than in the case of takings of such other privately created rights as leaseholds or easements, or indeed, such privately created elements of value as improving one's property." Kanner, 1976 *Institute on Planning, Zoning and Eminent Domain, supra,* 245. *See also Adaman Mutual Water Co. v. United States, Allen v. Detroit, Peters v. Buckner,* and *Meredith v. Washoe County School Dist.,* all *supra.* As the court aptly observed in *Horst v. Housing Authority, supra,* 166 N.W.2d at 121, the government cannot

"be permitted to inflict damage without liability simply because it is the government."

Yet another theory adduced by the minority is that to allow compensation for the destruction of a negative easement will impose undue expense and complexity on the government because of the great number of beneficiaries potentially or actually involved. *Houston v. Wynne, supra.* While the language just quoted from *Horst* seems to answer this concern, it has also been observed that the procedural difficulties are not insurmountable, and that the minority view in this respect is indefensible because it

> thereby [places] a disproportionate share of the cost of public improvements upon a few individuals. Neither the constitutional guarantee of just compensation, nor public policy permit such a burdensome result.

*So. California Edison Co. v. Bourgerie,* 107 Cal.Rptr. at 173, 507 P.2d at 968. As Professor Stoebuck has observed "the constitutional guarantee of compensation does not extend only to cases where the taking is cheap or easy." 56 Iowa L.Rev., *supra,* at 307. Moreover, the assumption as to greatly increased costs when there are large numbers of dominant tenements is not necessarily accurate, since, as Judge Mitchell recognized, the compensation for owners will diminish as distance from the attending public use increases. *See, e.g. Horst v. Housing Authority, supra.*

A few courts have expressed concern that if compensation for destruction of a negative easement is permitted, unscrupulous landowners, in anticipation of a governmental taking, will attach such easements to their land, thereby inflating the cost of condemnation. *See e.g. Smith v. Clifton Sanitation District, supra.* The possibility of abuse by some hardly seems a valid reason to deny compensation to all when, as in the instant case, they appear to have acted in perfect good faith. "If bad faith or sharp practices were established, a court could properly refuse to allow compensation." *So. Cal. Edison Co. v. Bourgerie, supra,* 107 Cal.Rptr. at 173, 507 P.2d at 968. This, indeed, was precisely what the courts did in

*Smith, supra,* and in *Taylor v. Van Wagoner,* 283 Mich. 215, 278 N.W. 49 (1938).[6]

Another and unique reason for denying compensation for the extinguishment of a negative easement was propounded by the Supreme Court of Arkansas in *Arkansas State Highway Commission v. McNeill, supra.* Recognizing that the minority jurisdictions had often given "somewhat dubious reasons . . . for denial of compensation" 381 S.W.2d at 427, that court held that the diminution in value of McNeill's land had been caused not by violation of the restrictive covenants involved but by the fact that a highway was about to pass through his property. It thus concluded that the reduction in value had not been proximately caused by breach of the restrictions, and denied compensation. As Professor Stoebuck has noted, "the result in the *McNeill* case is a non sequitur under the court's own reasoning." 56 Iowa L.Rev., *supra,* at 308. So far as we can ascertain, *McNeill's* reasoning has been adopted by no other court.

There is one other ground advanced by the minority jurisdictions, however, that we must consider. It is the theory that negative easements are not property rights or interests in property at all; therefore, no compensation is required when they are extinguished, because no property is taken. It is in this area that the majority and minority positions are in complete conflict.

The seminal cases supporting the minority view in this regard are *U.S. v. Certain Land* (112 F. 622) and *Moses v. Hazen,* both *supra.* The notion is that restrictive easements are not property rights because unknown to the common law, and that they are in any event mere contractual rights, not property rights. Neither reason withstands scrutiny.

---

**6.** If it is impermissible for government to use its zoning powers to "freeze" property values in anticipation of future condemnation action, *Hoyert v. Prince George's County,* 262 Md. 667, 278 A.2d 588 (1971), *Freeman Associates, Inc. v. State Roads Commission,* 252 Md. 319, 306 A.2d 250 (1969) it would seem equally impermissible for an owner to attempt to inflate the value of his property under similar circumstances.

It is no doubt true that at one time property was conceived of as tangible. But in the latter part of the nineteenth century the Hohfeldian notion of property as a bundle of rights, some tangible and some intangible, began to gain currency. Kanner, 1976 *Institute of Planning, Zoning and Eminent Domain* at 239–41. The constitutional concept of property for eminent domain purposes now addresses itself to every sort of interest the citizen may possess. *United States v. General Motors Corp., supra,* 323 U.S. at 378, 65 S.Ct. at 359; *Bureau of Mines v. George's Creek Coal & Land Co.,* 272 Md. 143, 321 A.2d 748 (1974). This concept has long been recognized in Maryland. The term property "extends to easements and other incorporeal hereditaments, which, though without tangible or physical existence, may become the subject of private ownership." *De Lauder v. Baltimore County,* 94 Md. 1, 6, 50 A. 427 (1901).

In this State, for example, that species of negative easement or servitude known as a scenic easement has been held to be property and compensable when taken by condemnation. *Hardesty v. State Roads Commission,* 276 Md. 25, 343 A.2d 884 (1975). Contract rights also may be property for such purposes. *Washington Suburban Sanitary Commission v. Nash,* 284 Md. 376, 396 A.2d 538 (1979) (timber contract). *Veirs v. State Roads Commission,* 217 Md. 545, 143 A.2d 613 (1958) (leasehold interest). *And cf. Lynch v. United States,* 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934) (Brandeis, J.). As *De Lauder* makes clear, an easement for ingress and egress is property for which compensation must be paid if the easement is destroyed. We agree with the Supreme Court of California that "[t]o establish a substantive distinction by merely labeling one [an easement for ingress and egress] a property interest for which compensation must be made and the other [a restrictive covenant] a mere contractual right which may be appropriated by a condemnor without any compensation is inequitable and rationally indefensible." *So. California Edison Co. v. Bourgerie, supra,* 107 Cal.Rptr. at 78–79, 507 P.2d at 966–67.

■ We hold "that lawful covenants restricting the use of land and binding upon successors in title [like those before us in this case] constitute an interest in the land, and property in the constitutional sense." *Horst v. Housing Authority,* 166 N.W.2d at 121.[7] *Cf. Rogers v. State Roads Commission,* 227 Md. 560, 177 A.2d 850 (1962). *See also Chapman v. Sheridan-Wyoming Coal Co., Inc.,* 338 U.S. 621, 627, 70 S.Ct. 392, 395, 94 L.Ed. 393 (1950) (dictum: restrictive covenant is an interest in land).

We further hold that when "the taking of the land by eminent domain permits a use violative of the restrictions and extinguishes such interest, there is a taking of the property of the owners of the land for whose benefit the restrictions were imposed, and such an owner is entitled to compensation...." *Horst, supra,* 166 N.W.2d at 121. In so holding we again espouse the majority view that such a taking occurs even though there is no physical invasion of the dominant tenement.[8] This view is consistent with the position the Court of Appeals has taken in regard to easements for ingress and egress. *De Lauder v. Baltimore County, supra.* The test for a taking is "the deprivation of

---

7. Accord: the cases and other authorities cited at pp. 426–427 *supra.*

8. WSSC attempts to distinguish some of the majority cases by pointing out, correctly, that in some of those jurisdictions the pertinent constitutional or statutory provisions permit compensation for both the taking or damaging of property, unlike Art. III, § 40 of the Maryland Constitution, which provides for compensation only when property is taken. In Maryland as a general rule, compensation for damages to a portion of a tract of land is required only when some portion of a unitary tract has actually been taken by the public authority. *Andrews v. Greenbelt,* 293 Md. 69, 441 A.2d 1064 (1982). Since we have found that WSSC has in fact actually taken a property interest, this argument is immaterial. Moreover, with the possible exception of Nevada (*Meredith v. Washoe County School District, supra*) we do not think that reliance was placed on any such differing constitutional provision. Instead, the holdings were clearly based on a finding that property was taken. *So. California Edison Co. v. Bourgerie, Burger v. City of St. Paul, Horst v. Housing Authority, Raleigh v. Edwards, Meagher v. Appalachian Elec. Power Co.,* all *supra.*

the former owner rather than the accretion of a right or interest to the sovereign. . . ." *United States v. General Motors, supra,* 323 U.S. at 378, 65 S.Ct. at 359, quoted in *Bureau of Mines v. George's Creek Coal and Land Co., Inc.,* 272 Md. at 157, 321 A.2d 748.

The taking in the case at bar has deprived the owners of the dominant tenements of their former right to enforce the restrictive covenants. This constitutes the loss of a valuable property right, even absent any physical invasion of the dominant tenements. That such a taking is compensable is well settled in Maryland. *Stevens v. City of Salisbury,* 240 Md. 556, 214 A.2d 775 (1965) (confiscatory zoning); *Sanderson v. Baltimore,* 135 Md. 509, 109 A. 425 (1920) and *Walters v. Baltimore & Ohio Ry. Co.,* 120 Md. 644, 88 A. 47 (1913) (destruction of access to property).

We conclude, therefore, that Judge Mitchell was correct in deciding that the negative easements taken by WSSC were property interests for which compensation must be paid. But neither that decision nor our agreement with it suffices to resolve all aspects of this appeal. There is a remaining issue—the ability of property owners in "the general neighborhood" of Site 2 to recover compensation.

*Appellees in "the General Neighborhood"*

As we observed early on, there are two classes of appellees here. One consists of owners of property within the industrial park tract. That their properties are dominant tenements with respect to the restrictive covenants to which Site 2 was subject prior to its acquisition by WSSC is clear. So is their right to compensation by virtue of WSSC's taking of the property interest which those negative easements represent. The other class consists of appellees Phillips, Peterson, Cross and Blackburn, who allegedly own property adjacent to or in the general neighborhood of the industrial park. WSSC says that they are "strangers to the declarations of restrictive covenants" and thus not entitled to compensation.

This assertion, which WSSC makes only in passing, and without citation of authority, is factually incorrect. As we have seen, the covenants ran in favor of owners of property adjacent to and "in the general neighborhood" of the industrial park as well as in favor of the owners of property within the park. The problem is that Judge Mitchell made no factual findings as to whether any of the members of this second class of appellees were indeed the owners of properties adjacent to or "in the general neighborhood" of the industrial park. These factual determinations must be made before it can be decided whether any of appellees Phillips, Cross, Peterson, and Blackburn may be entitled to compensation.

> In construing the meaning of a restriction on the use of land, the court must determine the intent and purpose of the parties at the time the agreement was made, which is a question of fact. In making that determination the court must consider the language of the instrument itself, giving the words their ordinary and generally understood meaning unless it plainly appears from the context that the parties intended to use them in a different sense, or that they have acquired a peculiar or special meaning in respect to the particular subject matter. Where the language used in the instrument is ambiguous, the court must also consider the circumstances and conditions affecting the parties and the property at the time the agreement was made. [footnotes omitted]

*Metius v. Julio,* 27 Md.App. 491, 498, 342 A.2d 348 (1975). *See also Turner v. Brocato, supra,* 206 Md. at 351–52, 111 A.2d 855, and *Brown v. Miami Valley Hosp. Soc. of Dayton,* 104 Ohio App. 53, 146 N.E.2d 620, 626 (1957) (meaning of "vicinity" in restrictive covenants).

Because the trial court did not determine the meaning of "adjacent" or the "general neighborhood" as used in the 1956 declarations of restrictive covenants, and therefore, did not decide whether appellees Phillips, Cross, Peterson, and Blackburn own properties within either category, we must vacate the decree as to them, and remand the case for

further proceedings. As to the other appellees, the judgment is affirmed. Even as to them, however, there must be further proceedings with respect to the amount of compensation to which each is entitled.[9]

JUDGMENT AFFIRMED IN PART AND VACATED IN PART. CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. APPELLANT TO PAY THE COSTS.

---

**9.** Because the question has not been presented to us, we express no opinion as to the measure of damages for those entitled to compensation. Helpful discussions of this subject are found in II American Law of Property, § 9.40, p. 450, 2 Nichols on Eminent Domain § 5.15, p. 219–228, Aigler, 1945 Wis.L.Rev. at 36, and Kanner "Restrictive Covenants in Condemnation" 1976 Institute on Planning, Zoning and Eminent Domain (Southwestern Legal Foundation) pp. 254–56, as well as in many of the cases adopting the majority position; see pp. 426–427, *supra*. The American Law Institute has taken no position on this question; see *caveat* following § 566.5 Restatement, Property.