BRADLEES TIDEWATER, INC., ET AL.

V.

WALNUT HILL INVESTMENT, INC.

Record No. 890867

April 20, 1990

Present: All the Justices

*James C. Howell (Willcox & Savage*, on briefs), for appellants.
*Michael Hugh Krimminger (Melrod, Redman & Gartlan*, on brief), for appellee.

CHIEF JUSTICE CARRICO delivered the opinion of the Court.

On February 21, 1989, Walnut Hill Investment, Inc. filed a bill of complaint for an injunction restraining Bradlees Tidewater, Inc. and Stop & Shop Companies, Inc. from discontinuing the operation of a Bradlees store located on leased premises in the Walnut Hill Plaza Shopping Center in Petersburg. Bradlees Tidewater and Stop & Shop appeal from a mandatory injunction awarded April 21, 1989, ordering them to operate a retail business on the leased premises not less than six days a week and six hours a day.

The lease agreement which is at the core of this controversy was entered into on March 27, 1959, and covers 82,000 square feet of the 175,000 square-foot shopping center. Walnut Hill is the successor in title to the original landlord, and Stop & Shop is the successor in interest to the original tenant. Bradlees Tidewater is the wholly owned subsidiary of Stop & Shop.

On June 7, 1988, as part of a plan to discontinue operations in Virginia, Stop & Shop assigned the lease to Bradlees Tidewater. According to the terms of the assignment, Stop & Shop remains liable to Walnut Hill under the lease.

On August 15, 1988, Bradlees Tidewater and Stop & Shop entered into an agreement to sell to The Hechinger Company all the right, title, and interest of Bradlees Tidewater in the lease covering the Petersburg store, as well as other Bradlees stores in Virginia. The agreement had a closing date of March 13, 1989. Bradlees Tidewater began liquidating the inventory and equipment used in the Petersburg operation preparatory to closing the store and assigning the lease to Hechinger.

In January 1989, Walnut Hill learned that Hechinger did not plan to operate any business at the Petersburg location and had not located a substitute tenant. Walnut Hill then instituted the present proceeding.[1]

On February 23, 1989, the trial court entered a preliminary injunction maintaining the status quo at the Petersburg store, which had the effect of halting the liquidation of the store's inventory and equipment. This injunction was based upon the ex parte affidavit of an officer of the company managing the shopping center.

Another hearing was held on March 23, 1989. At that hearing, the trial court gave Bradlees Tidewater and Stop & Shop ten days within which to propose a plan "putting the store back in operation as quickly as possible." When Bradlees Tidewater and Stop & Shop proposed a plan utilizing only 30,000 square feet of the 82,000 square-foot store, Walnut Hill objected, and the plan was not approved. At a hearing held on April 17, 1989, the trial judge announced his intention to enter a mandatory injunction against Bradlees Tidewater and Stop & Shop.

Entered April 21, 1989, the injunction decree ordered Bradlees Tidewater and Stop & Shop to "operate a lawful retail business . . . in the space now occupied by a 'Bradlees' store in the Walnut Hill Plaza Shopping Center." The decree further ordered that the business operate "not less than six days a week and six hours a day, using the entire demised premises, and keeping approximately the current balance between storage and/or support areas and display areas of 22% storage and/or support to 78% display areas."

The decree also directed Bradlees Tidewater and Stop & Shop to "maintain the same number of employees and level of inventory

---

[1] The Hechinger Company was made a defendant to the bill of complaint in the court below and was named a party to this appeal. The assignment of the Petersburg lease to Hechinger was not consummated, however, and it has been stipulated that Hechinger should be dismissed as a party in this Court.

as occurred, on average, during the same month in the last three years." Permission was granted, however, to seek modification of the employee and inventory requirements if "a different number of employees and level of inventory may be appropriate."

■ In its preamble, the lease provides that the "Demised Premises"[2] shall be used "for only a department store or junior department store, including the retail sale of any or all merchandise and services, except as otherwise provided in Article XVIII of this lease." Article XIV provides that the "[t]enant shall during the term of this lease continuously use the Demised Premises for a purpose permitted by Article XVIII and shall keep the Demised Premises open and available for business activity thereon at least six hours per day six days each week."

Article XVIII provides in pertinent part:

(A) For a period of five years after the commencement of the term of this lease, Tenant may not assign its interest in this lease or sublet the Demised Premises in whole or in part without the written consent of Landlord, which consent Landlord agrees it will not unreasonably delay or withhold. After the expiration of . . . five years, Tenant may assign its interest in this lease or sublet the Demised Premises in whole or in part, and such assignee or sublessee may conduct any lawful retail business. . . .

. . . .

(C) In the event of any assignment of Tenant's interest in this lease said assignment shall not be effective prior to the time there shall be delivered to Landlord an agreement from the assignee to perform and observe all agreements and conditions in this lease. . . . Tenant . . . agrees that if it shall assign its interest in this lease or sublet the whole or any part of the Demised Premises, it shall remain liable for the performance and observance of all agreements and conditions in this lease. . . .

■ On appeal, Walnut Hill recognizes that, as a general rule, proof of irreparable damage is absolutely essential to the award of

---

[2] The lease states that the "Demised Premises" consist of "a store building having dimensions of one hundred seventy five feet by two hundred eighty six feet and a garden shop having dimensions of fifty feet by one hundred feet."

injunctive relief. *Carbaugh* v. *Solem*, 225 Va. 310, 314, 302 S.E.2d 33, 35 (1983). Walnut Hill states, however, that there is an exception to the general rule under which injunctive relief may be awarded in the absence of proof of irreparable damage. Walnut Hill argues that "[a] mandatory injunction has long been recognized as an appropriate remedy for the wrongful breach of a lease requiring continued operation of a business, particularly, as in this case, where clear and uncontradicted evidence of the breach and resulting injury is presented." In support of this proposition, Walnut Hill cites *Southern R. Co.* v. *Franklin, &c. R. Co.*, 96 Va. 693, 32 S.E. 485 (1899). *Southern*, however, is inapposite.[3] *Southern* involved this question: "Is the [lessee railroad company] bound to operate the leased road during the term of the lease, or may it rightfully abandon and cease to operate it?" *Id.* at 695, 32 S.E. at 486. This Court answered that the lessee was, indeed, bound to operate the railroad during the term of the lease, finding the obligation clearly expressed in the lease provisions. We affirmed the award of an injunction restraining the lessee from discontinuing operation.

In reaching a decision, the Court found it significant that "the general statute law of the State in force when the lease was made" provided that "an abandonment by a railroad company of its road, or a failure to use and keep it in good repair for three successive years, rendered the company liable to a forfeiture of its charter and of its property." *Id.* at 700, 32 S.E. at 487. The Court said it was "inconceivable that the [lessor] would have entered into a lease of its road which would permit its abandonment by the lessee with the consequent liability to a forfeiture of its franchises and property." *Id.* And the Court included "the possible, if not probable, forfeiture of [the railroad's] franchises and property" as one of the grounds supporting injunctive relief. *Id.* at 704, 32 S.E. at 489.

---

[3] Also inapposite is *Bookman* v. *Cavalier Court*, 198 Va. 183, 93 S.E.2d 318 (1956), cited by Walnut Hill for the proposition that "the courts of the Commonwealth are not powerless to redress a clear and undisputed non-monetary breach of a lease covenant." Walnut Hill references a portion of the *Bookman* opinion which states that " 'courts of equity have not hesitated to enforce by injunction a covenant assuring the lessee the sole or exclusive right of conducting a certain kind of business on the landlord's property.' " *Id.* at 186, 93 S.E.2d at 320 (quoting 32 Am. Jur. *Landlord and Tenant* § 159 (1941)). The present case, however, does not involve a covenant of the type or dignity considered in *Bookman*.

■ Here, there is no statutory backdrop against which to determine the rights and liabilities of the parties. Furthermore, unlike the cessation of rail service, Walnut Hill cannot claim the public interest is impacted by the closing of a retail business.

Hence, Walnut Hill does not come under the exception to the general rule and is not entitled to injunctive relief in the absence of proof of irreparable damage. In the trial court, Walnut Hill undertook to prove such damage on the sole theory that, because Bradlees Tidewater was the anchor tenant in the shopping center and the closing of its store would adversely impact upon the center's overall well-being, Walnut Hill would suffer irreparable damage and, accordingly, was entitled to an injunction requiring continued use of the leased premises as a Bradlees store. That this was Walnut Hill's theory of the irreparable damage issue, and the theory upon which the issue was tried below, is demonstrated by the record excerpts which follow.

In the affidavit upon which the preliminary injunction of February 23, 1989, was based, Claude N. Rouben, vice-president of the company managing the shopping center, stated that "[t]his [Bradlees Petersburg] retail store is the 'anchor tenant' of the Shopping Center." Rouben pointed out that the Bradlees store occupied more than one-half the total surface area of the shopping center and asserted that "the loss of the 'anchor' tenant has a devastating and immediate impact upon the viability of a retail shopping center." Rouben went on to say that "[t]he 'anchor' tenant attracts retail customers and other retail tenants because the 'anchor' tenant, with its large selection of goods and extensive marketing efforts, provides the base for smaller, more specialized businesses." The loss of such "anchor" tenant, Rouben continued, "results in the rapid loss of additional tenants and retail customers because it reduces the attractiveness of shopping in that center."

In an ore tenus hearing conducted on March 7, 1989, Rouben testified that loss of the Bradlees store would be "catastrophic . . . because Bradlees is the main anchor, in fact, the only anchor of the shopping plaza." He also opined that "[o]nly a department store" would "be able to occupy a space of [the] size [of the Bradlees store]."

Cecil W. Simmons, another witness called by Walnut Hill at the ore tenus hearing, explained in detail the importance of an anchor tenant to a shopping center and stated that the Bradlees store qualified as such a tenant. This witness also stated that the

presence of a new regional shopping center in the area would leave only a "slim chance" of finding "an anchor of [Bradlees'] size" and would make "very difficult" the assessment of Walnut Hill's damages occasioned by the loss of Bradlees as an anchor tenant.[4]

In oral argument below, counsel for Walnut Hill referred to Bradlees as an "anchor tenant" and emphasized the impact upon the shopping center which would result from the loss of its anchor tenant. For example, at the ore tenus hearing on March 7, 1989, counsel for Walnut Hill told the court, in referring to the Bradlees store, "losing that anchor tenant is really a crucial thing."

On appeal, Walnut Hill seeks to abandon its "anchor tenant" theory and to adopt a different one. However, we review cases on the theory upon which they were tried in the court below. *Myseros* v. *Sissler*, 239 Va. 8, 9-10 n.2, 387 S.E.2d 463, 464 n.2 (1990).

It is obvious why Walnut Hill wants to abandon its "anchor tenant" theory. The theory is seriously flawed. Under the plain language of the lease in this case, an assignee or sublessee was required to play the role of anchor tenant only during the first five years of the lease, and that period has long since expired.

While the preamble to the lease requires that "[t]he Demised Premises shall be used for only a department store or junior department store," the preamble also states that the requirement applies "except as otherwise provided in Article XVIII of this lease." Article XVIII provides that after the expiration of the five-year period, the lessee may "assign its interest in the lease or sublet the Demised Premises in whole *or in part*, and such assignee or sublessee may conduct *any lawful retail business*." (Emphasis added.)[5]

---

[4] Walnut Hill argues that "[t]he difficulty or impossibility of measuring the actual injury to the plaintiff in damages establishes an inadequate remedy at law and, therefore, irreparable injury." But the difficulty of measuring damages in this case stems, as Walnut Hill concedes, from the impacts "on the [Walnut Hill] Shopping Center and its tenants of changes in the retail shopping patterns in the Petersburg area created by the opening of a new competing shopping center nearby and changes in the Petersburg real estate market." These impacts, however, may or may not be proper elements to consider in assessing Walnut Hill's alleged damages, and we do not consider them now in determining whether Walnut Hill has proved irreparable damage sufficient to support injunctive relief.

[5] As noted previously in the text, Article XVIII (C) requires that an assignee agree to perform and observe all agreements and conditions a tenant must perform and observe under the lease.

■ It is conceded that Bradlees Tidewater and Stop & Shop are assignees within the meaning of Article XVIII. Hence, since the five-year period has expired, they may conduct *any* lawful retail business, not just a Bradlees-type department store or one otherwise qualifying as an anchor, and they may use *part*, and sublet part, of the leased premises in conducting such business.

■ This view is not changed by Article XIV, which contains the so-called "continuous use" requirement upon which Walnut Hill relies. Article XIV requires only that the "Demised Premises" be kept open for *business activity*, not for a specific business constituting an anchor tenant, during the prescribed periods. And, while it is true that the term "Demised Premises" is defined elsewhere in the lease to mean the entire 82,000 square feet of the Bradlees store, in application the meaning must vary as the context in which the term appears may vary. In Article XIV, now under consideration, the context in which the term appears is a clause which provides that the "Demised Premises" shall be used *"for a purpose permitted by Article XVIII."* (Emphasis added.) And, as noted above, Article XVIII permits an assignee or a sublessee to use the premises for the purpose of conducting any lawful retail business on *only part* of the premises.[6]

■ Because Walnut Hill did not prove that it suffered irreparable damage from the alleged breach of the lease in this case, it was error for the trial court to grant injunctive relief. Accordingly, we will reverse the decree appealed from, dismiss Walnut Hill's bill of complaint, and enter a final decree here in favor of Bradlees Tidewater and Stop & Shop, all without prejudice to any action for damages which may result from the alleged breach.

*Reversed and final decree.*

---

[6] Walnut Hill claims it holds the whip hand when it comes to subdividing the leased premises and subleasing portions "to multiple retail operations." Walnut Hill states that Article V of the lease requires its "reasonable consent to *any* 'alterations, other improvements or installations to or upon the Demised Premises.' " (Emphasis added.) We have read Article V for ourselves, and it does not read the way Walnut Hill says it reads. Instead, it reads:

Tenant agrees not to make any *structural* repairs, alterations, other improvements or installations to or upon the Demised Premises without on each occasion obtaining the prior written consent of Landlord, which consent Landlord agrees not unreasonably to delay or withhold. Landlord agrees that Tenant may at any time and from time to time make any *non-structural* repairs, alterations, other improvements or installations to or upon the Demised Premises. [Emphasis added.]

JUSTICE COMPTON, dissenting.

I agree with the trial judge's interpretation of the lease. He determined that the restrictive covenant requires the tenant, or any assignee of the tenant, "to effectively use the entire premises." Consequently, there has been a clear breach of the lease covenant set forth in Article XIV.

In Virginia, the law is settled that the "most efficacious remedy" for the breach of a lease covenant or restriction is by way of an injunction restraining the breach. *Bookman* v. *Cavalier Court, Inc.*, 198 Va. 183, 186, 93 S.E.2d 318, 320 (1956). The right to enjoin such a breach of restrictive covenants does not depend upon whether damage has resulted from the breach; "the mere breach is sufficient ground for interference by injunction." *Meagher* v. *Appalachian Power Co.*, 195 Va. 138, 147, 77 S.E.2d 461, 466 (1953). And, the grant or refusal of any injunction is within the sound discretion of the chancellor whose findings should not be disturbed unless plainly wrong. *Blue Ridge Poultry and Egg Co.* v. *Clark*, 211 Va. 139, 144, 176 S.E.2d 323, 327 (1970).

In my opinion, the trial court did not abuse its discretion, and I cannot say that its findings were plainly wrong. Therefore, I would affirm the award of an injunction.